# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS
### EAST ST. LOUIS DIVISION

| | |
|---|---|
| CITY OF METROPOLIS, ILLINOIS, a Municipal Corporation, and COUNTY OF MASSAC, a Municipal Corporation. | CIVIL ACTION |
| **Plaintiffs,** | Case No.: _____ |
| v. | **ORIGINAL COMPLAINT FOR DAMAGES, EQUITABLE, AND INJUNCTIVE RELIEF** |
| HONEYWELL INTERNATIONAL, INC. a Delaware corporation, individually and as successor-in-interest to Allied-Signal, Inc. | **Jury Demanded** |
| **Defendant.** | |

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................3

II.     NATURE OF THE ACTION....................................................................3

III.    PARTIES.........................................................................................6

IV.     JURISDICTION..................................................................................7

V.      FACTUAL ALLEGATIONS....................................................................7

VI.     CAUSES OF ACTION

        COUNT ONE
        (*Violation of the Price Anderson Act, 42 U.S.C. § 2210 et seq.*)..................57

        COUNT ONE, SUBPART (A)
        (*Public Nuisance*)............................................................70

        COUNT ONE, SUBPART (B).............................................................71
        (*Negligence/Gross Negligence*)

        COUNT ONE, SUBPART (C)
        (*Trespass*)..................................................................72

        COUNT ONE, SUBPART (D)
        (*Nuisance*)..................................................................73

        COUNT ONE, SUBPART (E)
        (*Strict Liability*)..........................................................74

        COUNT ONE, SUBPART (F)
        (*Medical Monitoring*)........................................................75

        COUNT TWO
        (*State Law Claims as to Non-Radioactive Hazardous Substances/Wastes Only*)........75

        COUNT THREE
        (*Violation of CERCLA, 42 U.S.C. § 9601 et seq.*)............................77

VIII.   PRAYER FOR RELIEF............................................................79

## I.     INTRODUCTION

1.      The governing bodies of the County of Massac ("County") and the City of Metropolis ("City," collectively with County, "Plaintiffs") owe a duty to protect the health, welfare, and property of their citizens.  Radioactive and hazardous waste from defendant Honeywell International, Inc.'s ("Honeywell" or "Defendant") Metropolis Works plant presents a threat to that health and welfare in violation of Illinois state law, the Price Anderson Act, and the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA").

2.      Plaintiffs accordingly seek to abate the ongoing public nuisance, mitigate the risk of a catastrophic nuclear event, recover damages for contamination of City and County property, and preclude the restart of Honeywell's plant until its current, dangerous condition is abated.

## II.     NATURE OF THE ACTION

3.      Commencing in 1959 until its most recent shuttering in December 2017, Honeywell's Plant (the "Nuclear Plant" or the "Plant") located on the outskirts of Metropolis, Illinois processed uranium ore into uranium hexafluoride ("UF6"), a highly toxic radioactive gas used in the production of nuclear reactor fuel and atomic warheads.

4.      After its first few years of manufacturing UF6 for use in warheads, the demand for weapons-grade uranium dwindled, the Plant was shuttered and did not re-open until 1968 when demand for nuclear reactor fuel rebounded.

5.      Atomic Energy Commission (AEC) filings, now publicly available for review in an obscure library protected by heavily-armed security personnel in Maryland's D.C. suburbs, reveal that shortly after the plant's re-opening in 1968 the levels of radiation in soils throughout the community dramatically spiked. Despite such clear evidence that the plant was spreading radiation

far beyond its fence, Plant officials and federal regulators for decades consistently assured local officials the Plant presented no risk to the Citizens.

6.      For over a half century, winds continuously carried the radioactive and nonradioactive hazardous dust throughout the area in such concentrations that radioactive materials and non-radioactive hazardous wastes are found deposited in soils and buildings over 3 miles away from the plant covering a wide swath of Massac County and Metropolis.

7.      The Plant is located close to residents whose health, welfare, and property are to be protected by the City and County. The Nearest Residence is within half a mile of the Plant. The nearest school is at 1.9 miles from the Plant, the nearest hospital is 0.95 from the Plant, and the nearest nursing home is 1.7 miles from the Plant.

8.      Despite six decades of corporate assurances, scientific evidence shows the Plant has secretly been endangering the health, welfare, and property of citizens under the protection of the City of Metropolis and Massac County.

9.      Cancer data collected by the Illinois Department of Health confirms what the City of Metropolis and Massac County officials have witnessed for years. The citizens are being ravaged by cancer at rates that can only be explained by the radioactive and hazardous waste that has wafted from the Plant over the community for decades.

10.     Air monitoring data collected by the Illinois Emergency Management Agency ("IEMA") further confirms that Honeywell has been intentionally misstating to local government officials, plant workers, local residents, and the Nuclear Regulatory Commission (NRC) the amount of radiation released into the community.

11.     Soil and dust samples taken from residential properties, commercial properties, and governmental properties throughout the community corroborate IEMA's air sampling and confirm

4

that the radiation emissions reported to federal regulators by the Plant were falsified to support the false assurances given to City and County officials.

12.     In remediation plans filed with the NRC in 2007, Honeywell revealed that in the event of a permanent shut-down of the Plant clean-up costs would exceed a quarter of a billion dollars because its property was far more contaminated than previously reported. The NRC honored Honeywell's request to hide that data from the public and local officials by designating the extent of the contamination as a "trade secret."

13.     Since ceasing operations in December 2017, the Plant has been and remains in a "ready-idle" state. Honeywell has repurposed the Plant into a uranium storage facility and global trading platform presenting new threats to the community that have not been disclosed to City or County officials charged with safeguarding the health, welfare, and property of their citizens.

14.     Reports in the financial press indicate that as of two years ago Honeywell was storing over 62 million pounds of concentrated uranium in what one of Honeywell's business partners described as the "world's largest uranium trading platform."

15.     On March 24, 2020, in an unprecedented abrogation of regulatory duty that jeopardizes the community's safety for decades, the NRC issued Honeywell a license renewal, extending the license term from 10 years to 40 years, longer than any similar licensee has ever received.

16.     The Plant's current license allows tens of thousands of metal barrels[1] to be stored exposed to the elements outdoors for forty years next to an abandoned industrial complex caked with flammable radioactive dust. However, now Honeywell represents they will reopen the Plant

---

[1] The highest off-site measurements ever recorded at the Nearest Residence were determined by NRC inspector to have been caused by a few rusting barrels of stored uranium.

as early as 2023, potentially creating even greater hazards. Given the Plant's decrepit state and history of contaminating the community, Honeywell must make massive upgrades to processing equipment, emissions controls and air monitoring systems before the Plant can run in a safe operating condition.

17.     Plaintiffs allege that re-starting the Nuclear Plant in its current condition represents a three-pronged threat: (1) any restart will cause the release of decades of layers of radioactive dust accumulated throughout the Plant into the surrounding environment; (2) a restart of the facility's equipment will, by its very design, release new and substantial amounts of radioactive dust to the surrounding environment; and, (3) a restart could ignite radioactive dust that, according to former employees, covers surfaces throughout the Plant, which would blast radiation into the surrounding City and County.

18.     Radiation and hazardous waste from the Plant are found in concentrations and doses so far in excess of limits set by the Price Anderson Act, CERCLA, the Clean Air Act, and Illinois law that the City of Metropolis and Massac County are left with no choice but to seek the relief as pled below.

## III.   PARTIES

19.     Plaintiff, the City of Metropolis, Illinois, is a municipal corporation, organized and existing under the laws of the state of Illinois.  Illinois Const. Art. VII, Sect. 7.

20.     Plaintiff, the County of Massac, is a municipal corporation operating in Massac County, in Illinois.

21.     Defendant Honeywell International, Inc. is a Delaware corporation with its principal place of business in New Jersey. The legal description of the property upon which the Nuclear Plant sits is: Section 3, Township 16 South, Range 4 East, and Sections 33, 34 and 35, Township 15

South, Range 4 East. Honeywell became the owner, operator, and licensee of the Plant via a 1999 merger consummated with a $14 billion stock swap in which Honeywell acquired Allied Signal, Inc. ("Allied"), the previous owner of the Plant. Plaintiffs bring this action against Honeywell International, Inc., individually, and as successor-in-interest to Allied and references to "Defendant" shall include both Honeywell and Allied.

## IV.   JURISDICTION

22.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 as this case arises under the laws of the United States.  The claim in Count One seeks relief for a public liability action under the Price Anderson Act, 42 U.S.C. § 221, *et seq.*, and the claim in Count Three seeks relief under CERCLA, as amended, 42 U.S.C. § 9601, *et seq.*, including 42 U.S.C. § § 9607(a) and 9613(b).

23.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(a)(2) in that a substantial portion of the events and omission giving rise to Plaintiffs' claims occurred in this district.  Venue is also proper in this judicial district pursuant to 42 U.S.C. § 2201(n)(2) because the nuclear incident giving rise to Plaintiffs' claims took place in this district.  Venue is also proper in this district pursuant to 42 U.S.C. §9613(b) and 28 U.S.C. § 1391(b) because the actual and threatened endangerments, release, injuries, and damages at issue are taking place and have taken place in this district.

## V.   FACTUAL ALLEGATIONS

### A.  The Nuclear Plant

24.     From at least 1959 until at least late 2017, Honeywell and its predecessor operated the Nuclear Plant on the outskirts of Metropolis, Illinois along the Ohio River.  The facility is a "uranium conversion" plant and occupies a special role in the nuclear power industry.

25.     Nuclear fuel is used to create nuclear power, and this fuel comes from a multi-step process.  First, uranium ore is mined, then "milled" through grinding into natural "yellow cake" uranium. The uranium is then processed (through "conversion") into uranium hexafluoride ("UF6").  The converted uranium may be "enriched" to a higher concentration for use in nuclear reactors or bombs. The Plant is involved in this "conversion" process of making uranium into uranium hexafluoride, a toxic radioactive gas that can then undergo enrichment or purification. Separately, the Plant also produces gaseous fluorine.

26.     The Nuclear Plant is the only commercial uranium conversion plant in the United States.  It initially operated under a federal Atomic Energy Commission ("AEC") contract until the Plant was mothballed in July 1964.  Four years later, in February 1968, it resumed commercial nuclear fuel cycle operations and since then, the Nuclear Plant has operated under a Source Material License permitting uranium conversion.

27.     The uranium conversion process works as follows: after natural uranium is mined all over the world and uranium ore concentrate is produced at mills (where it becomes uranium oxide or "yellow cake"), it is packaged into 55-gallon drums and sent to the United States, ending up at the Nuclear Plant.  There, workers would process the yellow cake and react it with fluorine to create uranium hexafluoride (UF6), the end product suitable for enrichment. The UF6 exits the process as a gas which is then cooled to a liquid and drained into 14-ton storage and transport cylinders. As the UF6 cools, it transitions from a liquid to a solid. The cylinder, with solid UF6, would then be shipped offsite to an enrichment plant.

28.     It is understood that the process of converting uranium oxide into uranium hexafluoride is complicated. The process to convert uranium ore to UF6 gas involves many volatile and soluble chemicals including fluorine, hydrofluoric acid, and uranyl fluoride.

8

29.     As one can imagine, handling fine textured radioactive powder is messy and would routinely result in releases of distinctively colored yellow dust to the air inside Plant buildings and to the outside environment.

30.     As succinctly admitted by Honeywell, *the Plant was not designed to prevent the escape of radioactive dust into the environment* and the company could not even control the amount of radiation on its own grounds.  More specifically, in the course of seeking a license amendment, on March 27, 2009, Honeywell asked the NRC to allow greater levels of on-site contamination exceeding its permit because, "[t]he original Honeywell plant design did not consider contemporary contamination standards. Thus, original engineering did not provide sufficient means to prevent contamination from leaking equipment and components...."

31.     "Wet" processes at the Plant, including the uranium recovery process, generated radioactive liquid waste which would be processed, treated, stored, and disposed of. Massive quantities of this waste were also discharged to the Ohio River.

**B.  Current State of the Plant and Danger to the Community**

**(1) The Staggering Costs to Decommission the Plant**

32.     According to the statements of Honeywell's representative, at a public May 3, 2018, Licensee Performance Review held before the Nuclear Regulatory Commission, the Plant existed in a "ready-idle" state with reported plans to resume operations at some point in the future.  The facility has never been decommissioned, and for this reason, no cleanup or other meaningful protective measures have taken place.

33.     NRC licensees, including Honeywell, are required to submit triennial Decommissioning Cost Estimates, which assess the cost to remediate the soil and buildings so the Plant property can be returned to unrestricted use after a facility is shut down.

9

34.     Twenty years ago, in 2000, Honeywell estimated decommissioning costs of approximately $99 million dollars; however, Honeywell did not support this figure with any environmental data (or "site characterization report") substantiating the actual level of contamination then-present and specifically, the amount of "soil impacted" by contamination. "Soil impacted" means that the soil is so radioactive that it must be excavated and hauled to a radioactive waste disposal site.

35.     When Honeywell finally prepared a site characterization report nine years later, in 2009, it found Plant area soil impacted to a depth of approximately 1 foot below grade in an estimated area of 624,075 square feet, plant area soil impacted to a depth of approximately 3 feet below grade in an estimated area of 69,609 square feet, and plant area soil impacted to a depth of approximately 6 feet below the surface in an estimated area of 30,013 square feet. *As of 2009, therefore, approximatively 883,345 cubic feet of soil around the Nuclear Plant was so radioactive that it needs to be removed from the Property altogether.* Plaintiffs have found no evidence through their investigation or in the public record that Honeywell ever removed these massive quantities of radioactive soil.

36.     In its 2009 site characterization report, Honeywell further determined that the certain Plant buildings (the Feeds Building, the Uranium Recovery Building, the KOH Process Building, the Pond Muds Filter Calciner Building and the Ore Sampling Plant, noted on Exhibit B) *are so contaminated that they require complete dismantlement and removal.* And if and when they are ever dismantled, the building metals are so toxic and hazardous to the environment that they cannot even be sold as scrap metal, but rather, must be disposed of as radioactive waste. Plaintiffs have found nothing through their investigation or in the public record that Honeywell ever dismantled or disposed of these radioactive buildings.

10

37.     Because of the substantial, recognized contamination existing at the Plant (based on an actual site characterization report and not merely its prior conjecture), Honeywell's cost estimate for decommissioning, previously estimated to be $99 million dollars in 2000, nearly *doubled* to $187 million dollars in 2009.

38.     For decommissioning purposes, one particular item of grave concern is the current state of Honeywell's onsite landfill occupying 11 acres on the northeast portion of the property. This landfill received waste from approximately 1959 to 1998, including approximately 10,000 drums which, according to historical data, were allegedly empty at the time of disposal. Though the exact contents of this landfill are unknown, Honeywell has since admitted to the NRC in a decommissioning cost estimate that this substantially contaminated area must be addressed.

39.     In December 1971, the Illinois Environmental Protection Agency ("IEPA") found that the onsite landfill was an illegal open dump which had not been reported to the agency. The landfill waste was not spread, compacted, or covered in any way. IEPA further observed piles of flammable materials and other debris along the road to the open dump and outside the dump area.

40.     After the IEPA's inspection, the Plant Engineer recommended to the Plant Manager that Honeywell cover up its violations and "bulldoze [the contaminated] material and spread it around so that it will not look like another dump" and "bulldoze the various piles of debris outside our plant dump into the gully behind the dump and grade the area smooth."

41.     Honeywell's 2009 decommissioning cost estimate for its landfill admits that up to *54 million cubic feet to a depth of 30 feet* must be excavated and removed to remediate the extensively contaminated area.  Plaintiffs have found nothing through their investigation or in the public record that Honeywell ever remediated the radioactive and toxic landfill that sits on the property today.

42.     Though Honeywell publicly asserts that the Plant now is "ready-idle," the company admitted in its 2017 application to renew its nuclear license that, if operations were to resume in the Plant's current condition, it would "likely continue the *trend* of increased uranium deposition in soils and sediments both onsite *and offsite in the immediate vicinity* of the plant."  In short, Honeywell admits to the Plant's historic "trend" of contamination and that that "trend" will continue if it is to restart operations in its current condition.  By Honeywell's admission, a Plant restart in the Plant's present condition will lead to violations of public health safety laws and directly impact the environment, Plaintiffs, and the community with highly toxic and radioactive uranium.

43.     As set forth *supra* and *infra*, Plaintiffs allege that re-starting the Nuclear Plant without implementing necessary changes will represents a three-pronged threat: (1) any restart will cause the release of decades of layers of radioactive dust accumulated throughout the Plant to the surrounding environment;  (2) a restart of the facility's equipment will, by its very design, release new and substantial amounts of radioactive dust to the surrounding environment;  and, (3) a restart could ignite radioactive dust that covers surfaces throughout the Plant, which would blast radiation into the surrounding community.

44.     But, even if the Plant remains "ready-idle" as Honeywell claims and does not resume any operations at all, conditions at the Nuclear Plant remain dire by virtue of the substantially contaminated condition of the property itself, which was already found *over a decade ago* to require the removal *of 54 million cubic feet of soil and the demolition of 5 contaminated buildings*.

45.     Moreover, while the facility sits idled, it continues to emit contaminated dust and pollute the surrounding community.

**(2)     The Heavily Contaminated Site is a Current Threat to the Community**

12

46.     Not only are the systems which release radioactive dust still in-place, the entire facility is still caked in radioactive dust.  In December of 2019, Plaintiffs' experts conducted a site inspection that included observation and sampling of discrete areas of the Plant. The site inspection revealed extraordinary levels of uncontrolled radioactive contamination, a shocking level of disrepair and over 10,000 metal barrels of uranium ore exposed to the elements. The Plant is unfit to restart in its current condition because any restart would harm the public health and environment.

47.     The Plant is not leak-tight and is managed without proper health protections.

48.     According to Plaintiffs' experts conducting the December 2019 site inspection, Honeywell's facility is not of the proper type of construction to accommodate the type of operation it proposes to restart.  Much of Honeywell's plant is constructed out of substandard or flimsy building materials.  For example, the entire exterior wall of the Feed Building is constructed out of thin sheet metal.

49.     Plaintiffs' site inspection revealed that the Nuclear Plant is falling apart.  Plaintiffs' experts observed hundreds, if not thousands, of small holes in the outside walls of the Feeds Building and other buildings on the property. According to Plaintiffs' experts, one 20-feet high by 30-feet long section of wall has at least 45 holes, which appear scattered like a buckshot.  Plaintiffs' experts also observed numerous pipes entering and leaving the facility that pass through larger, poorly cut, irregular holes cut into the side walls with no seals, including several 8-inch and 10-inch pipes exiting the building through rough-cut 24-inch holes.

50.     Further, Plaintiffs' experts noted deep cracks in the rubber gaskets between flanges in dust collection systems directly behind the Feeds Building, which would permit dust to escape into the outside atmosphere.

51.    Plaintiffs' sampling results further confirm the extremely contaminated and hazardous current condition of the plant.  To illustrate this, the federal government has determined that the "background" or standard expected level for uranium in soils in the Metropolis area is *0.4 picocuries per gram*.  By stark contrast, dust collected by Plaintiffs' experts from a fan in one of the Plant buildings was over ***200,000 picocuries per gram***.  This fan was designed and operated to blow highly potent radioactive dust from the Plant ***directly to the atmosphere and local community without any pollution controls whatsoever***.

52.    Plaintiffs' certified laboratory tests also found radioisotopes of plutonium, thorium, and radium in Feeds Building dusts and X-ray analyses of other dusts collected at various locations contained particles composed of more than 95% uranium by weight.

53.    Further certified laboratory testing revealed the presence of highly combustible and highly radioactive dust sampled from the Feeds Building.  This raises the imminent, concrete, and terrifying prospect of an ignitable dust fire spreading a catastrophic amount of radioactivity into the community.  Ignition, which commonly occurs in grain-silo fires, will be disastrous given the radioactive and hazardous substances contained in the Feeds Building and the Plant.  Many ignition triggers exist which could initiate the combustion, including but not limited to structural failures, poorly maintained equipment, power surges or sparking, lightning strikes, earthquake, or even dry windy conditions.  A restart of the Facility would immediately increase the number of ignition sources throughout the Facility, exponentially heightening the already grave danger to Plaintiffs and their citizens.

54.    Defendant knew or should have known of the risk of a radioactive dust fire.  In fact, the NRC warned licensees of the risk of uranium oxide dust fires in their 1992 Information Notice No. 92-14: Uranium Oxide Fires at Fuel Cycle Facilities.  Despite this knowledge, during its most

recent license renewal Honeywell told the NRC that "Since the combustible loading at the [Plant] is low, the probability of a fire that could result in consequences approaching the severity levels given in 10 CFR 70.61 is extremely remote". The NRC was thus wholly unaware of this grave risk when it renewed the license and presumably is also unaware of the current threat to the community at large. Accordingly, there is no active emergency planning for the potential of a devastating radiation fire.

55.     Moreover, the types of radioactive and hazardous materials revealed by the site inspection are the same types of materials documented by Plaintiffs' testing at residential properties outside of the facility.  As further alleged herein, these include highly radioactive materials which are known to cause cancer and other hazardous substances.

56.     After Plaintiffs' December 2019 sampling and inspection, on March 25, 2020, the NRC granted the Defendant a 40-year renewal of its Source Material License despite the fact that in the Plant's history the longest license ever granted was for a ten-year term.  The NRC did so without having done any recent inspection of the current Plant condition.

57.     Though the Nuclear Plant is not currently operating, it continues to accept uranium ore shipments from around the world and remarks in the Congressional Record identify the Plant as "currently the largest global trading platform for UF6 and uranium concentrate." It appears that Defendant has converted the Plant into uranium storage depot. This however poses a constant threat of exposure to the community as decades of rainfall on metal barrels has led to massive radiation leaks that are harmful to the community. Plaintiffs' experts believe that the Plant is so contaminated that it presents a threat to the community in its current condition, and that without substantial modification, remediation, and improvement it is no condition to operate safely as UF6 conversion facility.

**C. Specific Operations and Buildings on Plant Property and How They Contributed to Contamination**

58.    The NRC found in a 2019 Environmental Assessment, that the Plant's air and liquid emissions reach "employees and members of the public in the immediate vicinity" through inhalation, ingestion of crops and animals, and contact via swimming and boating.  Though the NRC characterizes the emissions as "low levels" of radiation and contaminants, Plaintiffs' investigation and sampling results demonstrate that the public is subjected to much higher levels of radiation and contamination than what historically has been disclosed.

59.    As alleged below, the Plant conducted decades-long shoddy operations in violation of applicable standards and impacted the community far beyond what the law allows, including the emission into the environment of forbidden plutonium.

60.    The Nuclear Plant is depicted on the satellite image attached hereto as Exhibits B and C.  To put the Plant's shoddy historic operations and extensive contamination of the site and surrounding environment in context, a brief description of relevant buildings and processes is necessary.

**(2) The Feeds Building**

61.    During its history of operations, most of the Nuclear Plant's radioactive and chemical processes occurred in the Feeds Building.  That building is six stories high (105 feet tall), with uninsulated steel siding, similar in appearance to an oversized backyard metal shed available from The Home Depot.

62.    By Honeywell's reporting and its own calculations, the Feeds Building is the largest single source of contamination emanating from the Nuclear Plant into the surrounding environment. There, workers employed various mechanical and chemical processes that converted uranium ore from metal into a gas used in the production of nuclear fuel and atomic warheads.

16

63.     The conversion process released vast quantities of radioactive material in liquid, dust, and gaseous forms.  As uranium travels through this process, particle size varies from that of baby powder to coarse sand, making the material highly susceptible to air dispersion.

64.     According to worker accounts, workroom air was routinely contaminated, and management would regularly require them to wear respirators (red warning lights were installed throughout Plant buildings as a form of worker protection and when illuminated, workers would be required to don respirators).  Air contamination requiring the use of respirators would sometimes remain high for days at a time.

65.     Confirming worker statements, for example, the Nuclear Plant documented exceedances of acceptable air quality limits for 30 of the 31 days as early as December 1971.  Decades later, the Nuclear Plant was still documenting exceedances of acceptable air standards, including 14 exceedances in November 1998.  These exceedances continued regularly into the 2000's.  According to workers, the use of respirators became far more frequent after Honeywell began managing the Plant in 1999.

66.     The workers also describe that every floor of the six-story Feeds Building contained giant fans to blow workroom air outside and all over Metropolis—workroom air that was too radioactive for its own workers. These 48" box fans, placed on every floor of that building, sucked the air inside the Plant up and expelled that air into the atmosphere. These fans were so powerful, in fact, that they changed the route of air in the building every five minutes, 24 hours a day, 365 days a year, decade after decade.

67.     Plaintiffs allege on information and belief that this constant air re-routing would force radioactive dust to be expelled to the air outside from cracks in building pipes and holes in the building walls.  Plaintiffs further allege on information and belief that any collection system

used to contain radioactive dust from the Feeds Building could not have been effective given the condition in which the Feeds Building was maintained.

68. By workers' accounts and as NRC inspectors observed in 2001, radioactive workroom air would move even more freely to the surrounding and outside environment in the summer months. To give workers relief from summer heat, several 4-foot by 6-foot panels would be removed from the walls of each floor of the Feeds Building to create a breeze. Unfortunately for the surrounding area and its residents, removing the walls in this way left the radioactive dust uncontained, allowing winds to blow it all over the community.

69. Apart from this, even when the panels enclosed the building, holes in the roof allowed chemicals to be expelled to the surrounding environment. NRC inspectors noted in 2005 that on the northwest side of the top floor of the Feeds Building, roof leakage was so severe that if formed a pool of water approximately 10-feet long by 10-feet wide by 1-inch deep (approximately 62 gallons).

70. This leak existed and was still visible and observed by Plaintiffs' experts during Plaintiffs' December 2019 sampling event and site inspection. And, as set forth above, Plaintiffs' experts also observed many cracks, holes, and improper seals on the Feeds Building, which they believe allowed radioactive and toxic dust to escape into the surrounding environment.

**(2) "Green Salt" Section of the Feeds Building**

71. Uranium tetrafluoride (UF4), colloquially known as "green salt," is an intermediate uranium product created in the conversion process. Green salt is radioactive and extremely toxic. When not contained appropriately, green salt may discharge radiation into the surrounding air.

72.     The processing of green salt (which occurred primarily in the Feeds Building) involves passing reductor "off-gas" (the gas emitted as the byproduct of the chemical process) through primary and secondary filters and then, through a water scrubber and a caustic scrubber.

73.     According to workers, the dust filters were broken nearly every time the green salt equipment went down for maintenance, *which was two to three times per month*.  Workers further advised that there was almost no way to know if the secondary backup filter was broken since instrumentation was limited and did not contain any alert mechanism.

74.     When workers would discover by their own inspection that both filters were broken, the reductor beds would need to be slowly cooled to prevent equipment damage.  This cooling was known as "fluidizing the beds."   In this process, uranium gasses would flow over the beds for 4 to 6 hours during which time the gasses would leave the Feeds Building incinerator stack and be expelled outside.   There was no filtration system in place to prevent these emissions, which according to workers, *happened on a monthly basis*.

**(3)     Filters and Radioactive Dust "Bumping"**

75.     Throughout Nuclear Plant buildings and structures, filters—meant to protect neighboring properties from hazardous, toxic, and radioactive substances —would break and allow these materials to escape into the outside environment.

76.     For example, in 2005, Honeywell investigated and reported to the NRC that three of seven filter cartridges in the Feeds Building ash vacuum system had deformed gaskets that permitted dust and other materials to bypass the filters and escape to the air. On July 25, 2005, the failure of ash vacuum cleaner filters allowed uranium to be discharged outside the building and into the surrounding environment. Honeywell's ash vacuum filter system failed again on September 20, 2007, and yet again on March 3, 2009.

19

77.     According to workers, when green salt area filters would become clogged, workers would run the air flow backwards through the filter to clean it. This procedure was referred to as "bumping" the filter. While the "bumped" radioactive material was supposed to then run through a scrubber system, that system was routinely in disrepair, resulting in discharges outside of the Plant. Workers say that because releases to the outside would be colored and highly visible in daylight, management preferred to "bump" filters at night when they were less likely to be noticed.

78.     Aside from the filters, failing Feeds Building piping systems contributed to releases of radioactive and toxic substances to the outside. Failing purges and seals would require vibration by beating pipes with hammers to prevent clumping of radioactive material inside. But, according to former Plant workers, beating the pipes sometimes also caused pin hole cracks through which dust would leak. On an almost daily basis, employees saw these small cracks, evidenced by visible accumulations of dust. These pin-hole cracks contributed radioactive material to the air found in the Plant, and upon information and belief, may have found its way outside.

79.     In 1996, the Plant added a second fluorination reactor increasing Plant capacity from 11,500 metric tons per year to 12,700 metric tons. Then, in 2007, after re-engineering, Plant capacity increased even further to 15,000 metric tons. Though the Nuclear Plant significantly ramped up its production, it never increased the size of the filter bags used in "baghouse" areas around the Plant which were intended to collect contaminated air and remove radioactive particles. This contributed to frequent ripping of the filter bags, thereby allowing radioactive material and other toxins to escape into the environment.

80.     Though it added the second fluorination reactor to substantially increase Plant capacity, the Plant never correspondingly upgraded its treatment capacity to contain its radioactive and hazardous waste. This failure resulted in dramatic increases of contamination. Uranium in

liquid effluent, for example, *increased by more than 50%* immediately following the 1996 startup of the second fluorination reactor.

81.     By 1997, the problems had gotten so severe that the Plant's "ALARA" committee identified a trend of increased gas and liquid uranium emissions caused by significant leaks (the "ALARA" program is a federal rule under 10 C.F.R. Part 20, mandating that exposure to radiation be minimized to a level "as low as reasonably achievable").  Because the Plant's issues were so substantial, its ALARA committee formed an internal task force called the "Uranium Leak Repair Team" to track down and address the systemic problem of these leaks.

82.     Workers report that increased production in the late nineties, resulted in the "filter fines" (the most radioactive substances on-site) becoming both more radioactive and a finer powder. Drums of filter fines were so radioactive that they were routinely placed in the parking lot under armed guard until radiation levels declined enough to move them into a Plant structure.

83.     Workers also report that increased production led to a situation where production filter bags were not always changed in a timely manner, and production operations were sometimes conducted without a filter bag in place at all. This is known to have occurred on September 17, 1999, resulting in the release of uranium ore and, upon information and belief, this was not uncommon, and was instead at times as common as every couple of months. At these times, a visible stream of dust could be seen exiting the building.

**(4)     The "Drum Dump"**

84.     Another area of the Plant is known as the "Drum Dump," located under a large metal roof and open on three-sides. When fifty-five-gallon drums filled with powdered uranium ore arrived at the Nuclear Plant from all over the world, workers would empty them with the help of an automated "drum dumper." According to Nuclear Plant workers, each time the drum dumper

emptied one of the barrels, distinctively colored yellow radioactive dust would be released into the Plant air and also to the surrounding environment.

85.     After the drum dumper, the radioactive ore went into a dryer known as a "calciner," which would heat the radioactive material. Although the calciner was intended to contain the dust, vents from the device discharged into the atmosphere outside the Plant, adding another pathway for radioactive materials to migrate into the surrounding environment.

86.     After the radioactive contents of the drums was dumped into the calciner, the drums were then cleaned. Earlier in the Plant's history, in the 1960's and 1970's, workers would sandblast the drums, thereby expelling more radioactive and metal-contaminated dust into the ambient Plant air and outside into surrounding areas.

87.     Despite installing a dust collection system in the 1970's to contain the contamination, the Drum Dump Area remained highly contaminated. High airborne concentrations of contaminants were known in early 1977, but no action was taken, and the situation worsened through 1980.

88.     Indeed, by 1981, the NRC expressed concern that Plant management had not made any effort to implement the "ALARA" program or take appropriate reasonable steps to minimize exposure to radiation.

89.     The Drum Dump area remains contaminated today, as Plaintiffs' December 2019 sampling results confirm.

**D.   The Plant Operated in a Heavily Contaminated State: Chronology Over the Decades**

   **(3)   The Plant Contaminating the Community Immediately on Restart: 1968 Compared to 1967**

90.     Releases of uranium present a substantial and imminent threat to the environment and to public health and welfare. Released as a gas, the mixture separates as it encounters water in the atmosphere and the deadly uranium falls out as dust covering all below.

91.     Nuclear Plant workers have many anecdotal accounts of routine releases of radioactive and toxic dust into the ambient air inside the Nuclear Plant and outside of it.  Indeed, according to workers, leaks and spills were a daily part of operations at the Plant. While many were relatively small, massive spills also occurred and were documented in public records (as described below).

92.     The Plant began contaminating the community almost immediately after it resumed operations in 1968 from its previously mothballed condition. Within *months* of the reopening, federal inspectors (from the Atomic Energy Commission, prior to the NRC's existence) found that air sample data taken from various internal vacuum lines within the Plant showed activity several times greater than the "maximum permissible concentration"[2] for radioactivity in restricted areas.

93.     In the open-air Drum Dump area, federal inspectors found that air samples exceeded permissible levels on an almost daily basis.  It is no surprise then that air fallout and rainwater samples taken around the Plant just after the 1968 restart found radioactivity levels of 10 to 20 times greater than samples taken less than one year before, when the Plant was inactive.

94.     With respect to soil and vegetation, the 1968 samples showed the east side of the Feeds Building had much higher contamination than other onsite sample locations in the prior year. For soil and vegetation, therefore, *radioactivity levels increased over 30 times in the 5 ½ months between October 18, 1967, and May 1, 1968.*

---

[2] In radiology, "maximum permissible concentration" refers to the recommended upper limit for a dose which may be received during a specific period by a person exposed to ionizing radiation. "Maximum permissible concentration" may also be referred to "permissible dose" and the appropriate level is facility-specific and set forth in the facility's license.

95.     In this early time period, though records are limited, there are documented releases of radioactive and hazardous substances outside the Nuclear Plant and into the surrounding environment. Plaintiffs are also informed and believe that there were many undocumented releases of radiation and hazardous chemicals which were never disclosed.

96.     During a major event, residents in the community have advised that, on occasion an alarm would sound, warning of a "release" from the Plant. Rarely would such an alarm be accompanied by an acknowledgement or announcement by Plant officials.  According to residents, even on those rare occasions when a Plant official did say something, the message always took the same reassuring tone that any such release did not exceed regulatory limits and did not pose a risk of harm.

97.     The first documented major release occurred on October 22, 1968, involving the discharge of 30 pounds of uranium hexafluoride on the ground floor of the Feeds Building. The highest level of radioactivity measured during this release was *90 times the maximum permissible concentration allowed* in workroom air.

98.     This October 1968 release was dwarfed by a second less than one month later, on November 18, 1968, when a green cloud of pure uranium hexafluoride big enough to obscure the view of the Feeds Building from U.S. Hwy 45 rolled across the highway, up Mt. Mission Road and into the town of Metropolis. Despite the magnitude and visibility of this cloud of radioactive dust, the Plant reported that its off-site air monitoring (which, at the time consisted of gummed paper akin to flypaper, described below) did not detect any release at all.  The Plant did so despite the fact that witnesses say that *hundreds* of people saw the radioactive cloud roll across the ground.

99.     Workers explain that the November 1968 uranium release happened because a weld failed on piping in the basement of the Feeds Building while workers attempted to control a leak,

releasing gaseous and liquid uranium hexafluoride with explosive force. The escaped uranium immediately created a heavy fog (there was an estimate of visibility of only one inch). The two workers closest to the ruptured pipe were immediately hospitalized due to exposure.

100.    Plant estimates of the November 1968 release ranged from 80 to 180 pounds of uranium hexafluoride into the atmosphere. Again, a release of this magnitude occurred and was totally undetected by Honeywell's flypaper, which was the air monitoring protocol in place at the time.

**(2)    The 1970's**

101.    Upon information and belief, the Plant's operations continuously and substantially contaminated the environment throughout the 1970's. Plaintiffs' investigation is ongoing, however, and only limited historic records are publicly available in this time period, given that the NRC did not come into existence until 1977.

102.    There are, however, some documented exceedances of federal standards for releases of radiation. The absolute federal upper-limit standard for uranium released to an outside area was 5E10-12 uCi/ml. The Plant's fence-line air sample taken in December 1974 exceeded that absolute federal limit.

103.    On July 8, 1977, there was a major documented release of an estimated 200 pounds of uranium from process equipment in the Feeds Building. While the Nuclear Plant reported this release, it *vastly underreported* the amount of radioactive material discharged. In the same report stating that 200 pounds of material were released on that single day, the Plant also reported that only 90 pounds of uranium was discharged to the air for the *entire month* of July. This internally inconsistent reporting suggests that the Plant grossly underreported its uranium discharges.

25

104.    Former Plant workers further attest that emissions were historically a daily aspect of Plant operations, most of which were never documented or reported. As such, public records of reported releases, alone, are only a snapshot and do not provide an accurate picture of all the releases that emanated from the Plant at all relevant times.

105.    Indeed, a 1982 Los Alamos National Laboratory study of emissions from the Plant noted that leaks in the Feeds Building (which could reach the environment through the unfiltered exhaust fans), and failures of emissions controls would be "expected to occur fairly frequently"; however, no data was available for frequency, rate of release, and types of releases or for the extent and frequency of treatment equipment failure.

### (3)    The Plant's Mysterious Purchase and Destruction of Nearby Homes in the 1980's

106.    The Plant's course of contamination continued into the 1980's.  In 1988, the NRC found that, the Plant "averaged 28 spills and releases that are reportable" since 1984.  During 1987, 38% of the Plant's process pipes had deteriorated to such an extent that they had to be replaced due to corrosion.

107.    More evidence of historic contamination in the 1980's exists in data maintained by the National Institute for Occupational Safety and Health ("NIOSH") which composes site profiles containing information about a facility's general activities and radiation protection practices. Within the site profile, among other things, NIOSH assesses potential sources of radiation and exposure monitoring practices employed by the site over time.

108.    The NIOSH site profile for the Nuclear Plant lists *157 uranium releases from 1981 to 1985 alone*.  In total, the NIOSH profile lists over 240 events total events.  That is just a small subset of reported releases, there were, on information and belief, numerous unreported releases which happened in the normal course of Plant business.

26

109.    Indeed, it is likely no exhaustive list of all releases exists. Records obtained from the NRC and in Plaintiffs' investigation since NRC documents, other documents Plaintiffs have obtained, and the list referenced in the NIOSH report each attest to releases not documented in the other collections.

110.    Putting aside the lack of a complete set of records identifying the chronology of contamination, there is evidence from the 1980's that Honeywell's releases to the surrounding environment impacted nearby residents and the community at large.

111.    According to a report published by Los Alamos National Laboratory in 1982, NRC staff calculated that if an infant lived at the nearest residence, the lung dose caused by the UF6 facility would be approximately 42.5 mrem/yr, exceeding the limit set in 40 C.F.R. Part 190.

112.    During the second quarter of 1984, the Plant reported that the average airborne radioactivity at its "nearest residence" air monitor exceeded the permissible contamination level specified in its license (as explained below, at this time, the Plant was actually using a continuous air monitor device and not gummed flypaper). The Plant conducted an initial investigation, temporarily shut the Plant down completely, installed a ring of nine continuous air monitors. Though the Plant's initial investigation did not identify a root cause, it did reveal several possible sources of leaks, including a crack in an ore storage vessel, malfunctioning dust collectors, and ineffective scrubber systems. After extensive repairs to the plant, the observed emissions at the "nearest residence" began to gradually decline.

113.    In addition to air emissions of radioactive particles, the vast quantities of radioactive materials stored at the Plant emit high-energy gamma radiation. Gamma, or "direct," radiation is measured by devices known as thermoluminescent dosimeters ("dosimeters"). Dosimeters were

installed around the fence lines of the Plant and at the Metropolis Airport (which was intended to represent standard or "background" conditions) in 1978.

114.    In 1984, the NRC noted in an environmental assessment report prepared in connection with the renewal of the facility's license that the dosimeter posted at the north site boundary, just 300 feet from the nearest residence, showed a radiation dose rate in excess of applicable levels under the Price-Anderson Act.

115.    Due to this high reading, the NRC mandated that "[t]o determine the direct radiation levels at the residence and to ensure compliance with 40 CFR Part 190 (which limits off-site doses to a real person to 25 millirem/year), [the Plant] will be required to measure direct gamma radiation on the resident's property. [The Plant] will also be required to measure direct gamma radiation at other nearby locations, such as the residence where the air sampling station is located and at the hotel to the east."

116.    Plaintiffs are informed and believe that either: (1) the Plant did not comply with the NRC's directives requiring measurements of gamma radiation, or (2) the Plant did comply with the NRC's directive and later discovered that the results confirmed its violations of the Price-Anderson Act.  Plaintiffs have not unearthed the results of any gamma radiation testing mandated by the NRC, if such testing in fact ever occurred.

117.    Plaintiffs' investigation does reveal, however, that in 1987, the Nuclear Plant purchased *all* residential properties across from the Plant property along U.S. Route 45, from the union hall to Airport Road (a stretch of over half a mile), for $350,000 (a very significant sum at that time) and demolished all of the then-existing structures.  The previous location of these homes is indicated in yellow on the satellite imagery attached hereto as Exhibit C. Plaintiffs allege that the

circumstances and timing of these real estate purchases and the demolition of the buildings are suspicious and strongly suggest radiation exposure beyond that allowed by law.

118.    The Plant listed its residential property purchases in a 1990 license renewal application and designated them as a completed major project of the Plant's ALARA Committee (again, the Committee formed at the Plant having the responsibility for maintaining compliance with radiation protection standards and keeping radiation levels "as low as reasonably achievable"). There is no further information relative to the property transactions in the Plant's renewal application or any other publicly available NRC document.

119.    It should be noted, however, that because the Plant bought out its neighboring properties, the location of its "nearest resident" contamination monitoring changed over time: The Plant actively eliminated its initial "nearest residents" and chose a new "nearest resident" station several hundred yards further away (presumably outside what the Plant perceived to be a hot zone of gamma radiation).  Thus, the Plant's 1995 license renewal environmental assessment reflects a change in the "nearest resident" sampling station, which it chose to move to Mt. Mission Road, where it is today.

120.    At his deposition in related litigation, despite knowing that the nearest resident sampling station location changed during his tenure, the Plant Manager at the time claimed he does not remember anything about any testing results from sampling at the homes across the street or their purchase for such significant sums.

121.    Plaintiffs allege based on the evidence adduced that the Plant's original "nearest residents" were exposed to radiation far in excess of acceptable limits in violation of the Price-Anderson Act, and that the Nuclear Plant bought and destroyed the houses rather than upgrading its inadequate radiation controls to bring the facility into compliance.

**(4) Ramped Up Production and Failure to Adhere to Basic Housekeeping Protocols in the 90's**

122.   Leaks at the Plant were a constant problem beginning at inception and made worse after the addition of the second fluorinator unit in 1996 (reference above) which allowed the facility to significantly ramp up its production.

123.   On February 8, 1998, there was a documented release of 300 pounds of uranium oxide spilled onto a concrete pad outside the Feeds Building as a result of a seal leak from a calciner.

124.   In 1998, NRC inspectors observed visible accumulation of uranium on various pieces of process equipment and on several floor areas adjacent to equipment.

125.   The situation dramatically worsened after Honeywell took over management in 1999.  Prior to Honeywell's takeover, all floors and surfaces in Feed Building were washed daily as a matter of daily housekeeping. According to former Plant workers, a daily "decontamination crew" of four to ten men were assigned to sweeping and scrubbing floors and vacuuming, at the direction of the Health Physics Department. There was a daily work crew of ten dedicated to cleanup efforts, and each shift also had dedicated decontamination personnel.

126.   Sometime after Honeywell began managing the facility, dedicated decontamination workers were no longer assigned to each shift, and few decontamination jobs remained. Workers testified that this resulted in a dramatic increase in visible contamination in the Plant and delays in cleaning up and repairing leaks.  Workers further observed a marked increase in the number of personnel wearing respirators on-site.

**(5) Leaks and Release Events in the 2000's**

127.   Until as late as 2000, the Plant's filtration system "coke boxes" were a significant source of airborne uranium contamination. After the NRC mandated that the Plant take corrective action to address this, the uranium discharged to the environment decreased by a factor of three.

*This means that from 1958 through 2000, two-thirds of uranium discharges from the coke boxes could have been easily eliminated altogether.*

128.    In the 2000's, the NRC issued multiple violations to Honeywell for its failure to comply with basic standard operating procedures. The NRC commented specifically that expectations of Honeywell's management concerning applicable procedures were unclear and that management was accepting of site practices that contradicted procedural directives. The NRC had previously identified these issues in 1998, years before, but the NRC inspector reported that the Nuclear Plant did not adequately implement necessary corrective actions due to the lack of "senior management continuity" after Honeywell took over in 1999. Thus, systemic problems persisted into the 2000's and only worsened under Honeywell's management.

129.    In September of 2003, two documented major releases occurred.  One involved a chemical release from the Fluorine Products Building creating a plume that traveled past the rear fence line of the Plant. The second involved a UF6 leak that created a visible haze in the Feeds Building.

130.    Perhaps the most serious release incident of all occurred on December 22, 2003. While bringing the second fluorinator online, there was a release of uranium hexafluoride resulting in a visible cloud that traveled over the north fence. Honeywell had not maintained any standard operating procedure for bringing both fluorinators online for dual operation even though this activity had been performed multiple times in the past two years.

131.    At approximately 2:00 AM, increasing pressure from incorrect valve settings caused a control valve to leak UF6 into the Plant. When the leak was detected, the response team opened the dust collector valves. The accumulated uranium hexafluoride overwhelmed the dust collection system and was exhausted out of the building. The UF6 cloud was observed to travel beyond the

site boundary. Honeywell estimated that only 7 pounds of UF6 were released, but *Honeywell's independent consultant estimated the release to consist of 70 pounds of UF6, or ten times what Defendant reported.*

132.    At approximately 2:34 a.m., the Plant's Incident Commander requested that the Plant's Security Department notify the local authorities of the UF6 release. The Sheriff's Department dispatched officers to immediately evacuate 25 residents from their homes in the area surrounding the Plant and approximately 75 additional people were advised to shelter-in-place. Four residents were seen at the emergency room with suspected hydrofluoric acid inhalation exposure.

133.    Hydrofluoric acid (also known as hydrogen fluoride) is given off when uranium is released into the air.  It is also used as an agent of chemical terrorism. The chemical goes easily and quickly through the skin and into the tissues in the body.  Breathing hydrogen fluoride can damage lung tissue and cause swelling and fluid accumulation in the lungs. Skin contact may cause severe burns that develop after several hours and form skin ulcers. Inhaling or coming into contact with even small quantities of hydrogen fluoride can cause permanent damage and can even be fatal.

134.    Plaintiff Roger Steward's sister-in-law suffered significant injuries from exposure during this release and spent over a week in the hospital.

135.    Air samples taken during the 2003 event by the Plant and the state showed airborne uranium concentrations about *100 times above normal* for sampling nearest the site.  The Plant shut down for months after the 2003 release before gaining NRC approval to restart.  Again, this major release followed two significant releases just a couple of months before, in September of the same year.

136.    Apart from these major releases, in 2004, after conducting an inspection of the Nuclear Plant, NRC inspectors admonished Honeywell for its poor housekeeping, issuing myriad

violations.  They included: visible contamination on a primary piece of equipment which had been disassembled for repairs; a drum containing large pieces of green salt left uncovered; several drums containing filters with visible green salt left uncovered; and potentially contaminated gloves that had been improperly disposed.

137.    Workers further testify that, under Honeywell's management in the 2000's, preventative maintenance was non-existent, and that the routine was to run equipment until it broke rather than make any attempt at preventative maintenance.  Leaks, cracks, and holes in piping were patched, *sometimes just with duct tape to keep the process running*.  Management would wait until a critical failure occurred before conducting necessary repairs.

138.    NRC inspectors were aware of and complicit in these practices, noting in a September 2004 inspection report that half of the corrective actions required of Honeywell were an average of 35 days past due. Three months later, in its December 2004, the NRC reported that 77% of required corrections were overdue *by an average of 85 days*, meaning that Honeywell did essentially nothing for three months to address the backlog of needed repairs. The NRC inspector's write-up noted Honeywell's explanation for long-overdue repairs was that staff was "awaiting approval from corporate headquarters."

139.    In 2005, NRC inspectors observed a considerable amount of two different uranium compounds on a large outdoor concrete pad used for cleaning equipment. The contamination was from cleaning a boiler condenser *had been left there for at least a week without being cleaned up*, allowing it to be blown or carried offsite into the community.

140.    In 2007, after completing the disassembly of equipment that resulted in a significant release of a uranium byproduct from another outdoor pad area, Honeywell personnel failed to clean up the byproduct. Its distinctive yellow color provided evidence of widespread contamination that

33

had been allowed to accumulate for some time. When NRC inspectors returned *over 4 months later, the pad area was still contaminated and had not been cleaned up.*

141.    In 2008, NRC inspectors observed more visible contamination on-site in multiple areas of the Feeds Building, including visible contamination in the light fixtures and the entry door to the Feeds Building control room.

142.    In less than one year's time, between October 17, 2008, and March 29, 2009, *there were 40 contamination events cited in NRC inspection reports, 37 of which had not been timely reported.* The majority of these events involved "dust-outs" which consisted of uranium particles released into the air, usually from the green salt production process.

143.    In 2008, Honeywell began using a different "smear media" to measure the accumulation of contamination at the Nuclear Plant. Essentially, this kind of sampling involves taking wipe samples of various interior surfaces. The use of the new, more accurate smear media revealed surface contamination levels far in excess of the appropriate standards for indoor areas in the Feeds Building.

144.    In 2008, there were 33 instances of contamination in certain interior "uncontrolled" areas above actionable levels. "Uncontrolled" areas include common areas of the Plant used by workers (lunchrooms, walkways, etc.). These are *not* process areas where higher levels of contamination are expected. The presence of such levels of contamination in "uncontrolled" common areas evidence Honeywell's failures to adhere to basic preventative standards.

145.    In process areas, the contamination was even greater. Specifically, one process area of the Feeds Building, in September 2008, Honeywell identified levels of contamination *95 times greater* than its license limit.

34

146.   Rather than acknowledge all of its systemic problems, Honeywell conceded that higher contamination levels likely existed throughout the Plant's history, since "[t]he contamination levels in the processing areas have remained at a steady state since the plant began operation in 1958."

147.   Honeywell half-heartedly indicated that it was taking steps to reduce this substantial contamination through "several engineering efforts directed to reduction of the contamination level in the process areas," but Honeywell ultimately concluded that it could not keep its contamination within the parameters of its nuclear license since "the surface contamination action level of 5,000 dpm/100 cm2 (alpha) specified in the license is not sustainable for long-term operation in the process (Controlled) areas."

148.   Rather than undertake genuine efforts to control the contamination, Honeywell instead requested a license amendment to *increase its contamination limit by a factor of 44*, from 5,000 to 220,000 dpm/100 cm2.  The NRC agreed to increase the permitted limit to 75,000 but declined Honeywell's request to allow contamination levels of 220,000.

149.   Though Honeywell hired some additional employees to assist in decontamination and also had staff increase the frequency of performing radiation surveys, in 2010, NRC inspectors continued to note areas of radioactive contamination resulting from system leakage, or potentially in some cases, inadequate work practices.

150.   The Plant also routinely exceeded stack emission limits set pursuant to its NRC license and failed to take proper actions to fix these problems.  After stack emission levels are exceeded for three successive shifts, the NRC requires its licensees to investigate the cause.  In February 2009, a stack exceeded the NRC action limit for three successive shifts, and filter bags

were replaced as a corrective action. One week later on February 24, 2009, the same stack exceeded the action level for three successive shifts and no additional action was taken.

151.   Having exceeded these limits, Honeywell failed to complete the required investigations on the process stack secondary dust collectors in the Feeds Building. This occurred six times between January 3, 2009, and January 16, 2010. Two additional occurrences led to inadequate investigations. The same occurred for other equipment in the Feeds Building, including the #6 Dry Dust Collector on January 3, 2009, February 15, 2009, January 8, 2010, and January 16, 2010; the Ash Vacuum Cleaner on January 14, 2009; the Ash Dust Collector on February 5, 2009, and February 7, 2009; the UF4 Vacuum Cleaner on February 15, 2009, February 17, 2009, and February 24, 2009; and the #2 Wet Oxide Dust Collector on May 24, 2010.

152.   The Wet Oxide Dust Collector exceeded the action limit multiple times before doing so for three successive shifts on May 24, 2010, triggering a regulatory-required investigation. The stack continuously exceeded the limit from May 24, 2010, to June 6, 2010. The filter bags on the dust collector were replaced on May 27, 2010, but the stack emissions remained elevated for days before Honeywell took any additional action on June 3, 2010.

153.   Spills were also occurring in the regular course of operations in this time period there is evidence that radioactive and hazardous chemicals resulted in contamination inside and outside the Plant.

154.   On March 25, 2009, approximately 100 pounds of green salt fell out of the filter housing and out of the pipeline, covering the workers there and contaminating much of the Feeds Building.

155.   On February 14, 2011, a Plant worker noticed that *more than three tons of radioactive uranium* were released to the first floor and the basement of the Feeds Building.

36

156.   On May 30, 2012, approximately 21 pounds of uranium hexafluoride was released in the distillation area of the Feeds Building.

157.   On September 22, 2013, an improperly installed dust collection bag became dislodged, resulting in a release of filter fines in the Feeds Building from the stack of a secondary ash dust collector. The release contaminated an area south of the Feeds Building and covered UF6 cylinders, a road, and a vehicle with the most radioactive substance on Plant property.

158.   On October 26, 2014, uranium hexafluoride was released from a crack in equipment resulting in a haze in the Feeds Building. Honeywell failed to declare an alert relating to this release. Members of the community notified the NRC that they observed the cloud leaving the Feeds Building.

**E. Systemic Issues with the Low Boiler Condenser Go Unaddressed**

159.   Releases from low boiler condensers were a systemic problem at the Plant, which persisted over the decades and were never adequately addressed.  Plant emergencies were declared twice in 2001 and again in 2007 due to low boiler condenser issues, including a release that hospitalized two employees.

160.   Low boiler condenser issues occurred as early as July 8, 1977, and most likely, earlier.   Management was either unable or unwilling to correct these issues over time, and low boiler condenser issues persisted.

161.   During work on a low boiler condenser on January 27, 1998, three workers suffered chemical burns and uranium hexafluoride filled several floors of Feeds Building. The NRC found that "[t]he root cause of these apparent violations appeared to be that management's expectations for procedural adherence were not clear and had been eroded through acceptance of site practices

37

that contradicted procedural directions." Even worse, the Plant failed to declare an alert notifying the public or shut down the exhaust fans during this release.

162.    Again, on August 1, 2015, a low boiler condenser caused uranium hexafluoride smoke to fill the 6th floor of Feeds Building and exit through a vent creating a visible cloud outside. Honeywell estimated 12 pounds of UF6 were released at this time. The NRC was not notified. The plume of hydrofluoric acid given off in this 2015 release traveled in a southwesterly direction. The Plant's detectors mounted downwind of the release did not detect any measurable increase in contamination despite the plume that had been created.

**F. Improper Drum Storage and Waste Handling Activities Contribute to the Contamination**

163.    Improper drum storage was a recurring theme on Plant property. In 2009, NRC inspectors observed the poor condition of many leaking on-site storage containers used for uranium feed material, hard ore, potassium hydroxide drums, and filter fines, and concluded that many containers had deteriorated to the point that the metal had completely rusted through. Outdoor storage of uranium feed and waste materials contributed significantly to emissions.

164.    In terms of air monitoring, the NRC noted spikes in contamination results in 2009. The fourth quarter 2009 average level of fence-line radioactivity exceeded the limit set by NRC license, requiring an investigation. NRC and Honeywell concluded that these spikes in the air monitoring results were not driven by Feeds Building emission rates, but rather, by the Plant's waste handling and improper outdoor storage of drums on-site.

165.    Leaking drums of uranium ore concentrates had been a significant issue since at least the mid-1990s. By April 1999, the Nuclear Plant had reduced the quantity of drums from over 25,000 to 12,000, approximately 600 of which were leaking. NRC inspectors observed several

leaking drums and noted the Plant's ALARA Committee had set a goal of repackaging all leaking drums by September 1, 2000.

166.    The drums were not repackaged by September 1st, however, and many months later, in the second quarter of 2001, the nearest resident radioactivity concentration average exceeded Honeywell's license limit. Honeywell attributed this to the leaking ore drums that Honeywell acknowledged needed repackaging.

167.    As of August 2001, *over a year past the deadline,* 150 leaking drums were still located on Plant property. Honeywell blamed its failure to meet the deadline on "budgetary constraints," and promised to repackage the remaining drums by the end of August 2001.

168.    That promise was not fulfilled. In 2005, NRC inspectors found several rusted out 55-gallon drums leaking uranium ore concentrate on Plant property and in its buildings, onto the floor of the Bed Material and Filter Fines Building, East Pad, and the fenced-in Waste Management Area.

169.    Honeywell also improperly stored drums on-site containing uranium-contaminated potassium hydroxide mud ("KOH mud"), another potential source of dust emission to the surrounding environment.  This KOH mud is characterized as "mixed waste" under the federal Resource Conservation and Recovery Act ("RCRA") due to its uranium contamination and extreme corrosivity (which is due to its high pH).

170.    KOH muds were generally re-processed in the "Wet Process" of uranium recovery; however, in November 2002, Honeywell shut down part of the wet reclamation process it used to reclaim the uranium from the KOH mud, knowing that previously accumulated drums of KOH mud and any additional drums of KOH mud generated thereafter would have to be stored onsite until such time as the wet reclamation process was restarted. This resulted, along with the increased

production, in the accumulation of a *massive* quantity of KOH drums, stored on-site without a RCRA permit for years, a flagrant violation of federal law. This is especially problematic because, due to the extreme corrosivity, the barrels holding KOH muds degraded very quickly, resulting in spills in outdoor storage areas and discharges to the environment.

171.    In April 2009, EPA special agents executed a search warrant on Plant property and found *nearly 7,500 illegally stored drums containing waste that was both radioactive and hazardous*. In 2011, Honeywell pled guilty to criminal charges and agreed to pay a $11.2 million fine for its misconduct.

**G. Off-Site Contamination**

172.    There is no question of fact: The Plant leaked radioactive and hazardous contamination offsite into the community in various pathways. That contamination has not disappeared and remains to this day.

173.    The Nuclear Plant is itself covered in radioactive dust, which has been carried (and will be carried) into the City and County. Contamination is found within the facility. It is found in the soil and sediment around the facility. It is found in sampling of fans that push the facility's indoor air into the uncontrolled environment. It is found in liquid discharges, both through permitted and unpermitted outfalls, which are carried with stormwater through creeks into the Ohio River which is also used for recreation. Workers who come into contact with the dust and soil and air emissions end up with contaminated clothing and shoes. The dust sticks to vehicle tire treads, which are driven by workers back to their homes. The most significant carrier of the Nuclear Plant's toxic emissions is wind as contaminated dust particles found on equipment and the soil and sediment of the Plant is disturbed by wind and carried into the neighboring community.

174.    The pathways of exposure are not merely hypothetical. Honeywell's radioactive contamination is found throughout the community. It is found in the creeks leading all the way to the Ohio River. It is found in community members' personal property. It is found in their attics and in the front yards where their children play.

175.    Residential, commercial and government property is contaminated by radioactive material and other toxic substances emanating from the Plant. Dozens of samples taken both in the City and County confirm an elevated presence of radioactive particles which are traced to the Plant.

176.    Environmental evidence indicates that property and persons in the City and County were exposed to toxic and radioactive substances and negatively impacted by the Plant's toxic and radioactive releases.

177.    Plaintiffs' environmental sampling and scientific testing of properties throughout the Metropolis area reveals the presence of radioactive and toxic materials consistent with those expected to be found in a facility converting uranium ore into uranium hexafluoride gas, such as the Plant. Tests reveal the presence of these radioactive and toxic materials in residences in Metropolis.

178.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Thorium-232, Thorium-228, Lead-210, and Radium-226 in the soil and household dust of City and County residents far in excess of background levels. Using ICRP modeling and standard EPA assumptions, Plaintiff's experts calculated annual radiation doses to residents solely for the exposure from soil or dust accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on resident's properties today. These calculations show widespread exceedances of the dose limit allowed under 10 C.F.R. § 20.1301(e). Soil samples show doses up to 469.37 mrem to the bone surface of a three-month-old, 174.7 mrem to the bone surface of a one-

year-old, 310.24 mrem to the bone surface of a fifteen-year-old, and 57.31 mrem to the bone surface of an adult, and household dust samples show doses up to 6,450.89 mrem to the bone surface of a three-month-old, 2,487.99 mrem to the bone surface of a one-year old, 4,742.15 mrem to the bone surface of a fifteen-year-old, and 1,490.62 mrem to the bone surface of an adult, dozens of times higher than the 25 mrem regulatory limit.

179.    Additional sampling results confirm the heavy contamination found in the community.  Nearby residences were shown to be contaminated with metallic thorium, a metal that does not occur in nature, but which is used in the manufacture of advanced nuclear munitions.

180.    Analysis conducted by respected and independent laboratories of Plaintiffs' 2019 soil samples shows hits for plutonium and other radioactive metals in the field across U.S. Route 45 where houses were purchased and destroyed by Defendant. Plaintiffs' experts have concluded that the Nuclear Plant is the source of this plutonium, cesium, and americium.

181.    Scientifically accepted analysis of samples has revealed the presence of "fingerprints" linking the materials either stored, processed, and/or manufactured at the Plant to the contamination found in the City and County.

182.    The fact that the concentration and detection frequency of uranium associated with Defendant's operations declines the farther one gets from the Plant, and that by far the highest levels were found at the residences closest to the Plant, further implicates Honeywell.

183.    Toxic, radioactive contamination found throughout the Metropolis community is linked to the Plant as the exclusive source by the sampling results. First, the contamination itself is of the particular type emitted by the Nuclear Plant and not emitted by any other nearby facilities, ruling out alternative sources. Second, toxic radioactive contamination is found in increasingly higher amounts nearer the Plant; a dead giveaway that it is the source of the contamination.

184.     Sampling results, the weight of certain contaminants, wind data, and other evidence makes it possible to establish a general map of distribution of Honeywell's toxic contamination throughout the community.

185.     The radioactive contamination matches the waste profile and fingerprint of the hazardous, toxic, and carcinogenic radioactive wastes linked to Plant operations.

186.     Off-site sampling at distances up to three miles from the Plant reveal radioactive and hazardous waste contamination deposited on private residential, agricultural, commercial, and government properties throughout Massac County and the City of Metropolis.

187.     Wind, erosion, and flooding carry contaminants from one property to another through the process of resuspension that continually redistributes the radiation.

188.     Citizens are not only exposed to the radiation on their own property.  Their exposure continues as they carry out their daily lives at schools, parks, ball games, stores and offices contaminated by the Plant.

189.     The fact that radiation from the Plant is ubiquitous throughout the area has created a public health catastrophe that goes beyond the interests of any individual property owner to the abatement of this continuing threat to the health and welfare of the Citizens of Massac County and Metropolis.

**H. Elevated Cancer Rates**

190.     For decades, the Nuclear Plant has dumped massive amounts of cancer-causing pollution into the Metropolis community, and the consequences are now becoming pronounced in the form of elevated cancer rates throughout the area that has matured into a public health catastrophe.

191.    Toxic contaminants found throughout the Metropolis community are both dangers generally and are also known to cause specific types of cancer.

192.    There is no dispute that exposure to radioactive contamination increases the risk of certain types of cancer and that in combination with other hazardous substances that risk can be increased even further.

193.    The risk of cancer posed by the extensive carcinogenic contamination in the Metropolis area correlates with abnormally high cancer rates in the area.

194.    Review of publicly available cancer data maintained by the State of Illinois, reveals statistically significant excess risk of cancer on the bronchus/lung, colon, and rectum cancers in the periods 2006 to 2010 and 2011 to 2016 for the zip code surrounding the plant- 62960.

195.    Self-reporting of cancer by members of the City and County indicates extremely high rates of blood cancer, thyroid, and a collection of extremely rare cancers.

196.    In short, there is a direct link between the Plant's operations and the community's elevated cancer rates. The County of Massac and the City of Metropolis face not only an on-going public health crisis from cancers caused by the prior contamination but also the risk of imminent harm presented by the on-going radioactive contamination from the Plant's current uranium storage business and the threat of an ill-advised attempt to put The Plant back into operation in its decrepit state.

**I.   Honeywell Routinely Stored, Transported and Spilled Radioactive Calcium Fluoride on Massac County highways.**

197.    Calcium fluoride is produced at the Plant as a byproduct of treating their wastewater to remove fluoride prior to discharge. In 1982, the Plant installed a "Calcium Fluoride Recovery Unit" to produce purified calcium fluoride for commercial re-use. In 1993, Honeywell received a

license amendment authorizing the sale of this product to the steel-making industry. Because the calcium fluoride still contains residual uranium, the NRC imposed a limit of 313 ppm of total uranium in any calcium fluoride sold to a commercial entity and a requirement to test each batch produced and segregate any material exceeding that limit.

198.    The limit in the license amendment was based on a dose analysis that assumed very specific procedures for the storage and transportation of the calcium fluoride. The product was to be stored in a warehouse on Plant property and then transported by covered truck to a dock on the Ohio River nearby for barge loading.

199.    Contrary to these procedures, the calcium fluoride was stored within thirty feet of public highway Route 45.  There, it was piled into a three-sided concrete block structure that resembled a racquetball court with the radioactive hazardous mixture spilling out without even a fence or a gate to prevent access.

200.    Nearby residents witnessed the trucks transporting the white powder from the Plant to the three-sided shed.

201.    Honeywell tried to sell the calcium fluoride to steel mills, but it was rejected because the customers discovered the mixture was radioactive.

202.    Plaintiffs' experts observed and sampled a white powder that had been tracked onto Route 45 adjacent to the storage facility. Scientific analysis confirms the material is predominantly calcium fluoride and has shown that the total activity of uranium and daughter products in the white powder exceeds the limit set in Honeywell's license.

203.    County officials must act to abate the nuisance and harm presented by this illegally stored calcium fluoride to protect the health and welfare not only of its citizens but also of any public employees that might come in contact with the contaminated highway.

**J.  Green Salt Misrepresented to Local Governments**

204.   Local officials representing citizens of Massac County and the City of Metropolis have for decades relied on management assurances concerning the Plant's safety and adherence to its licensing requirements restricting the Plant's feed stock to natural uranium to ensure that the Plant's economic benefits did not come at the expense of the health and welfare of their citizens.

205.   A careful review of public documents reveals that unbeknownst to regulators or its own union employees, beginning in 1995, the Plant began accepting and storing on-site nuclear waste contaminated with plutonium (a byproduct of nuclear weapons production) relating to operations by Fernald Feed Materials Production Center ("Fernald") in Ohio. The Plant did not have a license to possess the plutonium it received from Fernald.

206.   Plaintiffs are informed and believe based on environmental testing conducted that this plutonium has been released to the environment surrounding the Plant and is currently contaminating the community, endangering the environment, and threatening the health and welfare of the public.

207.   According to the federal Centers for Disease Control and Prevention, most plutonium in the environment is in the form of microscopic particles that are the remnants of nuclear weapons testing and nuclear reactor accidents. When inhaled, plutonium is most dangerous as particles become lodged in the lung tissue. The alpha particles from plutonium can kill lung cells, which causes scarring of the lungs, leading to further lung disease and cancer. Plutonium can also enter the bloodstream from the lungs and travel to the kidneys, exposing these organs to alpha particles. Once plutonium circulates through the body, it concentrates in the bones, liver, and spleen, exposing these organs to alpha particles.

208.    For four decades, the U.S. government made uranium and thorium metal for the nuclear weapons industry at Fernald, Ohio. Fernald extracted uranium from scrap metal or recycled material (i.e., floor sweepings, dust collector and production residues) received from on-site operations and other nuclear weapons complex sites.

209.    After Fernald was shut down due to contamination, in 1994, it began shipping its remaining nuclear materials and nuclear waste to U.S. Department of Defense, private disposal facilities, to the Department of Energy National Lab, and to private corporations for reuse. An entity, FERMCO, was created to oversee and execute Fernald's cleanup operations.

210.    On June 2, 1995, Honeywell contracted with FERMCO to receive 665,547 pounds of green salt (UF4) and 43,034 pounds of uranium trioxide (UO3). The NRC was not notified.

211.    Beginning on October 10, 1995, Honeywell began receiving shipments from Fernald/FERMCO. The shipments were contaminated with plutonium, as a result of equipment cross-over, according to FERMCO (i.e., the equipment used to process the green salt that was sent to the Plant had previously been used to process irradiated materials at Fernald).

212.    Despite receiving product specification sheets showing the plutonium contamination, *Plant management was apparently unaware of the issues for a full year*, during which some of the material was dumped into the Plant's normal manufacturing process.

213.    Upon discovery of the plutonium contamination on November 1, 1996, Marshall Shepherd, the Plant's Regulatory Affairs Manager, recommended that the five lots of FERMCO material with greater than 20 parts-per-billion of plutonium be removed from the Plant.

214.    The material was not removed.  Rather, months later, on March 17, 1997, Defendant applied for a license amendment to possess "unirradiated UF4 that has been contaminated with Pu-

239." The Nuclear Plant announced its intention to sell and transfer the contaminated material overseas within 18 months. That sale never took place.

215. On May 6, 1997, the NRC amended the Plant's license allowing possession only of 9,000 pounds of unirradiated green salt (UF4) contaminated with plutonium (again, the Plant had agreed to receive 665,547 pounds of green salt from FERMCO, an amount far in excess of what was ultimately permitted).

216. On October 16, 1997, Defendant resumed dumping the remaining FERMCO green salt into the process. The plan was to dump six drums per shift when two trains were operating. Operators were instructed to space them out as much as possible and monitor the UF4 Blender closely because the FERMCO material had a very fine texture.

217. In a December 7, 1997, memo to the Plant, independent consultant George France expressed concern about potential entrainment of highly radioactive plutonium and technetium in the FERMCO material. Mr. France believed that plutonium oxide may collect in normal corrosion products deposited on piping and equipment, and that volatile technetium compounds may collect in off-gas filtering systems due to UF6 conversion.   The accumulation of these highly radioactive materials would greatly increase the contamination levels of the Plant.

218. On January 6, 1998, Defendant restricted dumping of all lots of FERMCO material found to be contaminated above a certain level. In February 1998, Plant staff secured approval from Chem Nuclear, a Low-Level Radioactive Waste Disposal Facility in South Carolina, to dispose of the restricted, contaminated material at the direction of Plant Regulatory Affairs Manager Marshall Shepherd. However, approval from the purchasing department was still needed, and no contaminated FERMCO material was ever shipped off-site for disposal.

219.    On February 26, 1998, Defendant restricted all lots of FERMCO material and ceased all dumping.

220.    On May 8, 1998, Honeywell applied for a license amendment to process: (1) 4,080 kg of unirradiated green salt contaminated with plutonium from FERMCO (previously identified in its May 1997 application for a license amendment), and (2) an additional 300,000 kg of green salt and 31,000 kg of other materials also found to be contaminated.

221.    The Plant asserted that no change in process would be necessary to convert the plutonium contaminated materials in-house: The Plant intended to down blend the contaminated green salt with other green salt and down blend the contaminated ore concentrates during the calcination stage.

222.    By 1999, nearly all the plutonium contaminated material had been fed into normal plant processes. After the last drum of green salt was dumped on December 7, 1998, 105 drums of green salt containing approximately 21,470 pounds and 83 drums of oxide containing approximately 43,000 pounds remained in storage. Plaintiffs have not uncovered any materials concerning about the final disposition of the remaining materials; however, the Source Material License was amended to remove all reference to plutonium contamination on January 21, 1999.

223.    Despite documentary and scientific evidence of the Plant's receipt and handling of plutonium in its normal processes, during a public Licensee Performance Review in Metropolis on May 3, 2018, NRC Region II Chief of Fuel Facility Inspection, Omar R. Lopez-Santiago, told community members that the Honeywell Plant has never had a license to handle plutonium.

224.    Honeywell knowingly brought into Massac County radioactive materials not permitted by Honeywell's nuclear license and willfully failed to comply with that license. Because

the Plant did not have a permit to handle plutonium, its unpermitted discharges of plutonium into Metropolis and Massac County were illegal.

### K. Honeywell's Vastly Underreported "Source Term"

225.    Honeywell has NRC, RCRA, EPA Toxic Substances Control Act, Clean Water Act, and Clean Air Act permits. But these permits do not allow Honeywell to emit uranium in quantities that violate strict federal "dose" standards, nor to emit any contamination that is not expressly allowed by permit term.

226.    An "emission" standard limits quality and quantity of releases at the point of release, whereas a "dose" standard limits the health risk at the point of contact with the receptor (e.g., humans).

227.    The "dose" is a calculable number that represents the health effects of low levels of ionizing radiation on the human body and the probability of radiation induced cancer and genetic damage. A "dose" cannot be directly measured but instead must be computed using a scientific model that starts with a "source term" and factors in all the pathways for exposure of the radioactive material, the ways the material is transported and deposited through the body, the different biological effects of different radioactive materials, and the age and other factors about the individual who is exposed. Annual limits on doses are the primary way federal regulations define a standard of care aimed at the exposure of workers and the public to ionizing radiation.

228.    The "source term" refers to the total amount of radioactive material released to the environment from a site over a specified period of time. Releases can be to the atmosphere, to surface waters, to groundwater, or to soil. An analysis of the "source term" is the starting point for any assessment of a radiation dose the public has received from exposure to radioactivity and its

radiological consequences. "Source term" is also critical to evaluate the additional risk of cancer to citizens of the City and County.

229.    The Price-Anderson Act sets forth that citizens impacted by a nuclear incident can recover damages. In the wake of Three Mile Island, federal courts began to use federal regulatory radiation dose limits as the relevant standard of care. The operative dose limits are set forth in 10 C.F.R. Part 20. More specifically, the operative dose limits to individual members of the public are set forth in 10 C.F.R. § 20.1301 and 10 C.F.R. § 20.1302 (and their predecessors 10 C.F.R. § 20.105 and 10 C.F.R. § 20.106). As set forth in 10 C.F.R. § 20.1301 and its predecessor 10 C.F.R. § 20.105, the operative dose limits to any member of the public applicable to a nuclear fuel cycle facility are set forth in 40 C.F.R. Part 190.

230.    Honeywell's source term (and therefore dose) reporting was vastly underestimated due to the faulty and inadequate air monitoring program in place, its historic underreporting of emissions, violations of permits setting allowable emission limits from licensed stacks and vents, worker accounts of regular leaks and spills and the results of the soil sampling conducted by Plaintiffs' experts which reveal substantial levels of contamination to the surrounding environment far in excess of what was reported.

231.    All of these factors contribute to the Plaint's Source Term and taking them into consideration, Plaintiffs are informed and believe that the true Source Term over the life of the Plant is over three times greater than Honeywell's public representations.

232.    Honeywell monitors certain emissions at certain times from certain locations on Plant property. Honeywell also reports those emissions in order to establish whether the Plant is within its emissions license limits. But the Plant's actual emissions are more accurately identified by analyzing the property around the facility. This is because Honeywell's emissions reporting and

NRC license application relies on Honeywell's own self-reporting, but the accuracy of Honeywell's reporting is questionable.

233.    For example, while Honeywell monitors the Nuclear Plant's stacks, ventilation points for air emissions from the buildings, and fence line air monitors, it fails to address releases from outdoor storage and from resuspension, which are aerated by wind, carrying it offsite into the community.

234.    Further, Honeywell's monitoring protocols have been ineffective. From 1968 until 1978, the only form of monitoring for the release of uranium into the surrounding community were two continuous air monitors placed at the fence line of the Plant. This system stayed in place until 1978, when the Nuclear Plant began to implement the monitoring system that still exists onsite today.

235.    Apart from the two air monitors, prior to 1978, personnel at the Nuclear Plant used gummed fallout paper (akin to flypaper) at a handful of monitoring stations to measure airborne nuclear contamination. Honeywell's predecessor, Allied Chemical, conceded that the flypaper method of air monitoring does not produce accurate results and is unreliable since data comparisons between the paper and the air monitors showed "no correlation."

236.    In 1980, Honeywell added five additional continuous air monitors to the fence line (for a total of 7), and, for the first time, two off-site continuous air monitors to monitor for radioactive emissions into the community. One off-site monitor was stationed at the "Nearest Resident" area immediately across from the Nuclear Plant's U.S. Route 45 entrance (note that, as set forth herein, the "Nearest Resident" location moved after the Plant's suspicious purchase in 1987 of all of the nearest residences in the area); the second was located at the Metropolis Airport,

about one mile away. The Metropolis Airport location was to serve as the point of comparison to illustrate "background" or standard environmental conditions in the community.

237.    After 1980 therefore, in addition to sampling from the stacks, Honeywell relied on just 7 fence-line air monitors, and just 2 offsite monitors, to support its emissions calculations. That system was woefully inadequate. According to Plaintiffs' experts, concentrations measured at any one point on the fence line from a release can vary dramatically depending on atmospheric conditions. Thus, the Plant's monitoring system can be expected to underestimate the size of any release by a factor of at least two 65% of the time, by a factor of at least ten 30% of the time, and by a factor of at least one thousand an astounding 10% of the time.

238.    Honeywell has repeatedly violated its permitted emissions limits with illegal emissions. As alleged in part in the chronology herein, Honeywell has either admitted or been cited by NRC investigators to operate the Facility in a way that has unnecessarily caused many unpermitted emissions.

239.    Honeywell also has a long track record of regulatory violations that suggest shoddy operations and illegal emissions. The timeline set forth indicates that Honeywell was a constant source of contamination problems while all the while increasing its production. And currently, Honeywell admits that further operations will necessarily emit more toxic contamination into the uncontrolled surrounding environment.

240.    The CAP-88 model is an EPA-developed method of calculating air dispersion of radionuclides from a facility, the resulting dose to the community and whether that dose exceeds the regulatory limit established in 40 C.F.R. Part 190, and thus constitutes a violation of the Price-Anderson Act. Since 2013, Honeywell has used CAP-88 modeling to demonstrate compliance with the regulatory framework. However, as pleaded herein, there is ample evidence that Honeywell

significantly underestimated the amount of radioactive materials released, thereby making its CAP-88 model and calculations inaccurate.

241.     Honeywell does not even attempt to measure its complete Source Term, choosing instead to estimate significant portions of its emissions. The Plant's air emissions are only actually measured from the process stacks, and even then, only uranium emissions are actually measured. Emissions from the exhaust fans are estimated based on the average radioactivity of the floor of the Feeds Building where they are located. Emissions of thorium and radium are estimated based on the ratio of thorium and radium to uranium in the incoming ore concentrate. There is little reason to think the emissions would have the same ratio, even though Honeywell makes that assumption. Indeed, the 1982 Los Alamos study found that the ratio of thorium to uranium actually measured by the continuous air monitors was ten times higher than the ratio in the ore concentrate, strongly suggesting thorium emissions were at least ten times higher than Honeywell reported.

242.     From the data unearthed to date and Plaintiffs' investigation of public records, air concentrations of uranium, radium, and thorium that Defendant collected from its air monitors reveal radiation levels that are consistently many times higher than those predicted using Defendant's officially reported emissions to the NRC and application of CAP-88 modelling software, even as far away as the standard "background" air monitor at the Metropolis Airport.

243.     In short, based on the actual sampling data collected from the monitors, Honeywell's "estimated" air emissions data greatly understates the radioactive material actually expelled from the Plant over its history.

244.     The sampling data reported to the NRC showed air concentrations of uranium and thorium as much as 14 times higher than expected for uranium and as much as 185 times higher than expected for thorium-230 for certain monitors in certain years.

54

245.    Perhaps most troublingly, there is limited, if any, statistical correlation between higher emission levels reported to the NRC and higher air concentrations found by the air monitors. Thus, comparing the reported emission data with the recorded air monitoring data strongly suggests that one or both sets of data are inaccurate.

246.    Comparing average concentrations of uranium from its semiannual monitoring reports from 1989 to 1993 to average concentrations reported from 2001 to 2017 shows an increase 7 to 20 times more than would be predicted from reported emissions and the CAP-88 model.

247.    Furthermore, Plaintiffs' investigation of available records and data obtained from the NRC reveals numerous inconsistencies and nonsensical data, raising significant questions about the accuracy and reliability of the data Defendant submitted to the NRC.

248.    That Honeywell's reporting was inaccurate is underscored by the results of soil sampling and testing in the area which show uranium contamination levels far in excess of what would be predicted based on Defendant's officially reported emissions.

249.    Most troubling of all, independent air monitoring conducted by the Illinois Emergency Management Agency ("IEMA") confirms that Honeywell's monitoring system has drastically underestimated the Plant's emissions. Since at least 1979, the State of Illinois has conducted independent radiation monitoring in the areas around nuclear facilities across the state, including the Plant. In particular, IEMA maintains continuous air monitors at the Metropolis Airport and at the "nearest resident", two locations where Honeywell also has continuous air monitors, allowing a direct comparison. The results from IEMA's air monitor at the nearest resident for total uranium *are consistently 3 times higher than Honeywell's results from the same location over the same time period.*

250.     Upon information and belief, Honeywell received copies of IEMA's monitoring results and failed to inform the NRC or the Plaintiffs or change any of their practices. Instead, Honeywell continued to willfully mislead regulators and the public as to the extent of their emissions.

251.     In order to account for the quantity of uranium found in soil samples taken by Plaintiffs, Plaintiffs are informed and believe that the Plant must have emitted substantially more uranium than Honeywell admitted in its statements to the NRC. Thus, the sampling results indicate that (1) Honeywell's self-reported emissions data is incomplete (and, correspondingly, that license applications and related environmental reports and environmental assessments undercount and underestimate emissions), (2) sampling results are a more accurate data point for calculating actual emissions from the Plant, and (3) Honeywell has emitted exponentially more toxic contaminants into the community than it admits.

252.     But even only considering Honeywell's admitted emissions, there are violations of federal regulations, including specifically 10 C.F.R. § 20.1301 (and its predecessors). Pursuant to 10 C.F.R. § 20.1301, "a licensee subject to the provisions of EPA's generally applicable environmental radiation standards in 40 CFR part 190 shall comply with those standards."

253.     Based on the Honeywell's reported Source Term of total reported radioactive emissions, the lung dose at the nearest residence from uranium emissions alone calculated by CAP-88 exceeded 25 mrem for adults in 1977, 1979, and 1984, and for 15-year-olds every year from 1977 to 1984 (with the exception of 1982), and again in 1999 and 2014. As noted above, Plaintiffs allege that the evidence strongly suggests that even this is a significant underestimate of community exposure to radioactive emissions.

## VI.    CAUSES OF ACTION

### COUNT ONE
### (*Violation of the Price Anderson Act, 42 U.S.C. § 2210 et seq.*)

254.    In 1957, Congress amended the Atomic Energy Act to implement its policy to foster private sector participation in the nuclear energy industry. These 1957 amendments became known as the Price-Anderson Act ("PAA").

255.    The uranium and other radioactive substances processed, handled, stored, and/or disposed by Honeywell at the Nuclear Plant include, but are not limited to, nuclear byproduct materials, special nuclear materials, and/or source materials within the meaning of the PAA. 42 U.S.C. § 2014(e), (z), (aa). Any release of these byproducts, special nuclear, or source materials causing bodily injury, sickness, disease, death, loss or damage to property, or loss of use of property constitutes a "nuclear incident" within the meaning of the PAA. *See* 42 U.S.C. § 2014(q).

256.    In 1988, Congress enacted the Price-Anderson Amendments Act of 1988, which explicitly created a federal cause of action for "public liability actions" arising from nuclear incidents. A "public liability action" is "any legal liability arising out of or resulting from a 'nuclear incident.'" A nuclear incident, in turn, is "any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material." 42 U.S.C. § 2014(q)).

257.    Plaintiffs allege an express cause of action under the PAA. Plaintiffs do so, however, while maintaining that the PAA does not contain any federal standards, regulations, or thresholds that apply to Plaintiffs' state-law claims, let alone that are incompatible or inconsistent with Illinois law, in part, because the PAA does not contain any federal contamination standards or other

that apply to Plaintiffs' state-law claims, let alone that are incompatible or inconsistent with Illinois law, in part, because the PAA does not contain any federal contamination standards or other thresholds for contamination that apply to Defendant's contamination of their *property*. As such, the PAA does not contain any federal standards, regulations, or thresholds that apply to Plaintiffs' state-law claims, and the PAA does not pre-empt those applied by state-law.

258.    As set forth below, to the extent any federal standard is applicable to Defendant's contamination of Plaintiffs' property, Plaintiffs allege that 10 C.F.R. § 20.1301, *et seq.* (and its predecessors) applies. Pursuant to 10 C.F.R. § 20.1301 and its predecessor 10 C.F.R. § 20.105, the dose limits contained in 40 C.F.R. Part 190 are applicable.

259.    Defendant's acts and omissions and negligent releases of hazardous, toxic, and radioactive waste materials in excess of federal regulatory limits (as set forth in 10 C.F.R. § 20.1301, *et seq.* and its predecessors) exposed citizens and property of the City and County to highly dangerous materials. Citizens of the City and County suffered loss or damage to property, loss of use of property, and increased risks of developing injury, sickness, disease, or death as a direct and proximate result of their exposures. Plaintiffs' cause of action therefore asserts legal liability based upon a "nuclear incident," or series of such incidents, and is consequently a "public liability action" within the terms of the PAA.

260.    Pursuant to the PAA, the substantive rules for decision in this action arising under 28 U.S.C. § 2210 shall be derived from the law of the State in which the nuclear incident occurred unless such law is inconsistent with the provisions of such section.  Here, Illinois supplies the law as the state in which the nuclear incident occurred.

261.    As set forth below, Honeywell's past, present, and likely forthcoming conduct in contaminating the City and County constitutes a public nuisance.

262.    Illinois substantive rules provide that a person is strictly liable for harm, injury, or damage arising from an abnormally dangerous/ultra-hazardous/unreasonably hazardous activity. Processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials which pose a significant risk of harm to persons living and working in the vicinity of the operation constitute such abnormally dangerous/ultra-hazardous/unreasonably hazardous activity under Illinois law.

263.    Defendant's conduct in the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials posed and will continue to pose significant risk of harm to persons living and working in the vicinity of the operation. The consequences of nuclear accidents or incidents to health, property, and the environment are extremely dire, and can be measured in millions, if not billions of dollars. It is not possible to eliminate all risk by taking reasonable precautions. Finally, the processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials has never been a matter of common usage; indeed, private operators historically were not permitted to engage in such activities at all. The conduct of Defendant's activities at the Plant constituted abnormally dangerous activities.

264.    Defendant owed to Plaintiffs a duty of due care which could only be satisfied by the legal, safe, and proper processing, handling, storage, and/or disposal of the radioactive, toxic, and hazardous substances in Defendant's possession. Defendant had a duty to prevent the discharge or release of such substances that might harm Plaintiffs' property.

265.    Further, Defendant had a duty to comply with applicable state, federal, and local governmental laws, regulations, and guidelines applicable to persons processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials.

266.    Defendant applied for, obtained, and operated pursuant to an NRC license. Defendant is liable for its activities at the site.

267.    Defendant has been and is subject to the provisions of EPA's generally applicable environmental radiation standards in 40 C.F.R. part 190, pursuant to 10 C.F.R. § 20.1301 and its predecessors.

268.    Defendant breached these duties by its negligent, grossly negligent, and reckless processing, handling, storage, and/or disposal of hazardous, toxic, and radioactive waste materials at the Plant. Such conduct was in utter non-compliance with applicable federal, state, and local laws, regulations, and guidelines. Defendant's negligent, grossly negligent, reckless, and illegal conduct resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the Plant. These actual and continued releases subjected Plaintiffs to an unreasonable risk of harm, and to loss or damage to property, or loss of use of property. Finally, Defendant failed to act to prevent its releases from harming Plaintiffs.

269.    To the extent Defendant was or is subject to applicable federal regulations, Defendant breached its duty by violating federal regulations with respect to levels of radiation and concentrations of radioactive materials in unrestricted (general public) areas.

270.    Defendant knew about the hazards associated with nuclear operations. The legislative history of the PAA, which was passed with the active participation of private companies involved in the nuclear power industry, is rife with references to the extreme consequences that could be expected in the event of a nuclear incident. Indeed, the gravity of such consequences was a major contributing factor to the passage of the PAA.

271.    Defendant knew or should have known that its generation, management, storage, use, disposal, releases, or discharges of radioactive, toxic, and hazardous substances, and exposure

60

to gamma radiation from uranium storage, in connection with their operations at the Plant would result in actual injuries and increased risks to the persons, property, and economic interests of the public without taking proper safety precautions.

272.    Defendant's acts and omissions and its negligence were a direct and proximate cause of Plaintiffs' injuries, causing both actual present harm and/or creating an increased risk of harm to person and property within the City and County. Plaintiffs are entitled to recover damages for such injuries.

273.    Because Defendant's conduct was intentional, malicious, grossly negligent, and reckless, Plaintiffs seek punitive damages.

274.    Properties within the City and County have been exposed to radiation above the federal dose limits set forth in 10 C.F.R. § 20.1301, *et seq*. and its predecessors.

275.    10 C.F.R. § 20.1301 ("Dose limits for individual members of the public") provides that "In addition to the requirements of this part, a licensee subject to the provisions of EPA's generally applicable environmental radiation standards in 40 CFR part 190 shall comply with those standards." Within 40 C.F.R. Part 190, 40 C.F.R.§ 190.01 ("Applicability") provides that "The provisions of this part apply to radiation doses received by members of the public in the general environment and to radioactive materials introduced into the general environment as the result of operations which are part of a nuclear fuel cycle."

276.    Defendant engaged in operations at the Plant that are part of the nuclear fuel cycle.

277.    40 C.F.R. § 190.10 ("Standards for normal operations") provides that "Operations covered by this subpart shall be conducted in such a manner as to provide reasonable assurance that: (a) The annual dose equivalent does not exceed 25 millirems to the whole body, 75 millirems to the thyroid, and 25 millirems to any other organ of any member of the public as the result of

61

exposures to planned discharges of radioactive materials, radon and its daughters excepted, to the general environment from uranium fuel cycle operations and to radiation from these operations."

278.    To the extent that 10 C.F.R. § 20.1301 applies to Plaintiffs' state-law claims, Defendant violated 40 C.F.R. § 190.10—which is incorporated into 10 C.F.R. § 20.1301 under subpart (e)—as to each Plaintiff, as detailed in the allegations below.

279.    The "Nearest Resident" air monitoring station is located on the property of a County resident within 0.4 miles of the Plant.

280.    For comparison, the annual average air concentration of uranium found by Defendant at this residence in 2003 was *469 times higher than background levels in Chicago* measured by EPA in 2007. The annual average air concentration of thorium-230 found by Defendant at this residence in 2003 was *161 times higher than background levels in Chicago* measured by EPA in 2007.

281.    Defendant emitted enough uranium in 2003 to cause a dose at this residence in excess of the limits established in 10 C.F.R. § 20.1301, *et seq*. and its predecessors.

282.    Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Thorium-232, Thorium-228, Lead-210, and Radium-226 on this property sufficient to deliver a dose of 85.9 mrem to the bone surface of a 3-month-old. Using International Commission on Radiological Protection (ICRP) modeling and standard EPA assumptions, the doses to the bone surface at this property are 3.4 times higher than allowed under 10 C.F.R. § 20.1301(e) and its predecessors. This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by Defendant which remain on the property today.

283.    Citizens residing at this property have been contaminated in excess of the limits established in 10 C.F.R. § 20.1301, *et seq.* and its predecessors to the extent that the property is no longer safe enough to use.

284.    Testing on other properties throughout the City and County has also revealed levels of contamination in excess of the limits established in 10 C.F.R. § 20.1301, *et seq.* and its predecessors.

285.    For example, Plaintiffs conducted testing on the property of a citizen residing within 2.89 miles of the Plant on property he owns located in the County. Scientific analysis of the soil on that property revealed the presence of Uranium-234, Uranium-238, Radium-226, Thorium-232, Thorium-228, and Lead-210 sufficient to deliver a dose of 298.62 mrem to the bone surface of a three-month-old, 114.7 mrem to the bone surface of a one-year-old, 202.05 mrem to the bone surface of a fifteen-year-old, and 37.33 mrem to the bone surface of an adult. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and an adult at the property are respectively 11.9 times and 1.5 times higher than allowed under 10 C.F.R. § 20.1301(e). This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on the property today.

286.    Scientific analysis of the dust inside that same property revealed the presence of Uranium-234, Uranium-238, Radium-226, and Lead-210 sufficient to deliver a dose of 1,455.25 mrem to the bone surface of a three-month-old, 264.11 mrem to the bone surface of a one-year-old, 853.48 mrem to the bone surface of a fifteen-year-old, and 110.52 mrem to the bone surface of an adult. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and an adult at the property are respectively 58.2 times and 4.4 times higher than allowed under 10 C.F.R. § 20.1301(e). This dose accounts solely for the exposure from dust

accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on the property today.

287.    On another individual's property located within 1 mile of the Plant in the County, scientific analysis of the soil revealed the presence of Uranium-234, Uranium-238, Radium-226, Thorium-232, Thorium-230, Thorium-228, and Lead-210 sufficient to deliver a dose of 469.37 mrem to the bone surface of a three-month-old, 174.7 mrem to the bone surface of a one-year-old, 310.24 mrem to the bone surface of a fifteen-year-old, and 57.31 mrem to the bone surface of an adult. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and an adult at the property are respectively 18.8 times and 2.3 times higher than allowed under 10 C.F.R. § 20.1301(e). This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on the property today.

288.    On a third individual's property within 1.2 miles of the Plant, also located in the County, scientific analysis of the soil revealed the presence of Uranium-234, Uranium-238, Radium-226, Thorium-232, Thorium-230, Thorium-228, and Lead-210 sufficient to deliver a dose of 164.03 mrem to the bone surface of a three-month-old, 48.05 mrem to the bone surface of a one-year-old, and 82.35 mrem to the bone surface of a fifteen-year-old. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and a fifteen-year-old at the property are respectively 6.6 times and 3.3 times higher than allowed under 10 C.F.R. § 20.1301(e). This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on the property today.

289.    Scientific analysis of the dust inside this property revealed the presence of Radium-226 sufficient to deliver a dose of 190.17 mrem to the bone surface of a three-month-old, 34.56

mrem to the bone surface of a one-year-old, and 111.56 mrem to the bone surface of a fifteen-year-old. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and a fifteen-year-old at the property are respectively 7.6 times and 4.5 times higher than allowed under 10 C.F.R. § 20.1301(e). This dose accounts solely for the exposure from dust accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on the property today.

290.    On a fourth individual's property within 1.4 miles of the Plant, also located in the County, scientific analysis of the soil revealed the presence of Uranium-234, Uranium-238, Radium-226, Thorium-232, Thorium-230, and Thorium-228 sufficient to deliver a dose of 162.07 mrem to the bone surface of a three-month-old and 43.75 mrem to the bone surface of a fifteen-year-old. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and a fifteen-year-old at the property are respectively 6.5 times and 1.7 times higher than allowed under 10 C.F.R. § 20.1301(e). This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by the Defendant which remain on the property today.

291.    On a fifth individual's property within 0.5 miles of the Plant, also located in the County, scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Thorium-232, Thorium-228, and Lead-210 sufficient to deliver a dose of 363.14 mrem to the bone surface of a three-month-old, 136.85 mrem to the bone surface of a one-year-old, 240.12 mrem to the bone surface of a fifteen-year-old, and 46.03 mrem to the bone surface of an adult. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a three-month-old and an adult at this property are respectively 14.5 times and 1.8 times higher than allowed under 10 C.F.R. § 20.1301(e) and its predecessors. This dose accounts solely for the exposure from soil

accidently ingested or inhaled in a year due to radionuclides released by Defendant which remain on this property today.

292.   On a sixth individual's property within 0.8 miles of the Plant, located in the City and County, scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-230, Thorium-232, Thorium-228, Lead-210, and Radium-226 sufficient to deliver a dose of 196.2 mrem to the bone surface of a three-month-old, 60.6 mrem to the bone surface of a one-year-old, and 105.97 mrem to the bone surface of a fifteen-year-old. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface of a 3-three-month-old and a fifteen-year-old at this property are respectively 7.8 times and 4.2 higher than allowed under 10 C.F.R. § 20.1301(e) and its predecessors. This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by Defendant which remain on this property today.

293.   On a seventh individual's property within 1.9 miles of the Plant, located in the City and County, scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-232, Thorium-228, and Thorium-230 sufficient to deliver a dose of 89.3 mrem to the bone surface of a three-month-old. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface at the property are 3.6 times higher than allowed under 10 C.F.R. § 20.1301(e) and its predecessors. This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by Defendant which remain on this property today.

16. On an eighth individual's property within 0.6 miles of the Plant, located in the City and County, Scientific analysis revealed the presence of Uranium-234, Uranium-238, Thorium-232, Thorium-228, and Thorium-230 sufficient to deliver a dose of 51.94 mrem to the bone surface of a three-month-old. Using ICRP modeling and standard EPA assumptions, the doses to the bone surface at the property are 2 times higher than allowed under 10 C.F.R. § 20.1301(e) and its

predecessors. This dose accounts solely for the exposure from soil accidently ingested or inhaled in a year due to radionuclides released by Defendant which remain on this property today.

294.    Moreover, as set forth above, even relying on the Plant's incomplete and underreported air sampling data confirms widespread violations of the Price-Anderson Act.  But the actual extent of the violations is much worse than shown by Honeywell's demonstrably false air emission reports to the NRC. Considering the numerous unreported emission points, unreported releases, worker accounts and actual soil concentrations of Honeywell's radioactive dust in the City and County, Plaintiffs allege that the true Source Term over the life of the Plant is over three times higher than Honeywell's representations. Plaintiffs further allege that the scientific and documentary evidence shows that Defendant has a regular practice of making materially false statements to the NRC about the risks of exposure of residents and the environment to radioactive material. An accurate Source Term, if Defendants had provided one, would confirm many more violations of the Price-Anderson Act.

295.    The overexposure to radiation caused Plaintiffs to suffer compensable injuries under the PAA. Specifically, Plaintiffs have suffered loss of property, damage to property, and loss of use of property. *See* 42 U.S.C. § 2014(q).

296.    Also, the City and County have experienced elevated rates of cancer and other radiation-related health problems caused by the overexposure to radiation. Plaintiffs' properties have been damaged by radiation overexposure which detrimentally affects Plaintiffs' use of their properties. This radiation contamination constitutes actual, physical damage to the Plaintiffs' properties. This damage is substantial and has caused a substantial interference of Plaintiffs' use of their properties.

297.    For example, the overexposure has caused diminution of property value, loss of enjoyment of property, annoyance, and inconvenience, all of which fit within the types of compensable damages set forth in 42 U.S.C. § 2014(q). Radiation is a highly potent form of contamination that physically impacts the property. Defendant's negligence has contaminated properties belonging to citizens of the City and County with harmful radiation, and in doing so has rendered these a large swath of the City and County unsuitable for raising children. Defendant's contamination now undermines the City and County's citizens' ability to allow their children to play in their yards and community, and their ability to live in their homes without elevated risk of health problems. The concentration of radioactive contaminants on Plaintiffs' properties is likely to (and, in fact, has) caused harm to human health in the form of elevated cancer rates and other health impacts such that it is unsafe to raise children on the property.

298.    Defendant contributed to the residents' overexposure to radiation through actions which contributed to airborne particulate matter containing radionuclides to contaminate City and County property in excess of 10 C.F.R. § 20.1301, *et seq.* (and its predecessors) by: (1) failing to properly contain enormous clouds of dust and excessive airborne particulate matter containing radioactive isotopes of uranium, thorium, radium, plutonium and their daughter products, which now contaminate Plaintiffs' property; and (2) failing to properly design, manage, repair, and operate the Plant.

299.    Plaintiffs have been, and continue to be, exposed to radioactive contaminants, which are known to be carcinogenic, and other hazardous and toxic materials at a concentration higher than expected for the general populace.

300.    The City and County's citizens now face a lifetime of latent and serious medical conditions proven to be linked to exposure to radioactive particles.

301.    One or more of Defendant's tortious actions resulting in radioactive pollution have invaded the legal protections afforded Plaintiffs by the laws of Illinois.

302.    Plaintiffs and their citizens will benefit from necessary medical monitoring for the aforementioned medical conditions because testing and continued monitoring will bring to light the onset of these medical conditions so that treatment and intervention may begin at the earliest point possible.

303.    Plaintiffs and their citizens will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other heretofore unrecognized latent, dread diseases that may be associated with exposure to radioactive particles may be identified so that treating professionals may better care for the their citizens, and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data. Such epidemiological data will be collected, maintained, and analyzed in such a manner as to protect the identity of individual citizens.

304.    Further, citizens of the City and County will require ongoing care for the conditions which are known to result from exposure to radioactive particles.

305.    The harms visited upon the City and County are irreparable.

306.    Money damages will not suffice because it is impossible to predict with any certainty the costs of such monitoring and treatment for each individual citizens, nor is it possible to predict new treatment and intervention protocol that may be developed as data from medical monitoring of Plaintiffs' citizens is provided to the medical research community.

307.    Furthermore, money damages will not suffice because an award of money damages for future monitoring and treatment would not result in comprehensive programs, whereby valuable

69

information is shared among the medical community so that new treatments, protocols, intervention, and tests may be developed.

308.    Plaintiffs accordingly seek a Court-administered fund replenished from time-to-time by Defendant to achieve such injunctive and equitable relief as necessary for the continuing benefit of their citizens, including a court-administered medical monitoring program.

309.    Pursuant to the PAA, the substantive rules for decision in this action arising under 28 U.S.C. § 2210 shall be derived from the law of the State in which the nuclear incident involved occurred, namely, Illinois, unless such law is inconsistent with the provisions of such section.

310.    Federal regulations control the standard of care for Plaintiffs' public liability action under the PAA. Under the umbrella of Plaintiffs' PAA claim, Plaintiffs assert the following state law causes of action.

## COUNT ONE, SUBPART (A)
### *(Public Nuisance)*

311.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

312.    As set forth more fully above, Honeywell has unreasonably interfered with the public's right to make full use of City and County property, including but not limited to their right to make use of public property.

313.    Specifically, Honeywell has significantly interfered with the public health, public safety, public peace, public comfort, and public convenience in processing, handling, storing, and/or disposing of hazardous, toxic, and radioactive waste materials at the Plant in a dangerous manner.

314.    As set forth more fully above and below, Honeywell's conduct constituting an interference with the public's common rights is proscribed by statutes, relevant regulations, and common law.

315.    Honeywell's conduct was the direct and proximate cause of its interference with the public's common right.

316.    Honeywell's conduct constituting an interference with the public's common rights is continuing and has produced long-lasting effects.

317.    Honeywell knows or has reason to know of its action's significant effect on the public's right.

## COUNT ONE, SUBPART (B)
### *(Negligence/ Gross Negligence)*

318.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

319.    At all relevant times, Defendant owed a duty of care to Plaintiffs to process, handle, store, and/or dispose of hazardous, toxic, and radioactive waste materials at the Plant in a reasonably safe manner and consistent with applicable laws, regulations, and guidelines set forth above, including, to the extent it is applicable, 10 C.F.R. § 20.1301, *et seq.* and its predecessors.

320.    Defendant caused unreasonable risk of harm, loss or damage to property, loss of use of property, and exposure to hazardous, toxic, and radioactive substances sufficient to require medical monitoring as set forth above to members of the City and County's citizens.

321.    Defendant breached its duty to Plaintiffs by its conduct, acts, and omissions when it processed, handled, stored, and/or disposed of hazardous, toxic, and radioactive waste materials at the Plant, as set forth more fully above.

322.    As set forth above, Defendant further breached this duty by failing to warn Plaintiffs of the risk of harm and actual harm caused as a result of its actions detailed in this Original Complaint.

323.   Defendant's conduct, acts, and omissions in violating its duty of care to Plaintiffs created an extreme risk of harm to others, as detailed above.  Moreover, Defendant knew of the extreme risk to Plaintiffs but proceeded anyway.

324.   As detailed above, Defendant's violations of its duty of care resulted in the dangerous release of hazardous, toxic, and radioactive substances into the communities surrounding the Plant and proximately caused damage to Plaintiffs.  These actual and continued releases subjected Plaintiffs to an unreasonable risk of harm, to loss or damage to property, loss of use of property, and exposure to hazardous, toxic, and radioactive substances sufficient to require medical monitoring as set forth above.

## COUNT ONE, SUBPART (C)
### *(Trespass)*

325.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

326.   At all relevant times, Defendant had and has a duty not to permit or allow hazardous substances transported to, used, or stored at its facilities to invade adjacent private properties in violation of applicable laws, regulations, and guidelines set forth above, including, to the extent it is applicable to 10 C.F.R. § 20.1301, *et seq.* and its predecessors.  Defendant also had a duty not to allow the continuance of this wrongful trespass.  Defendant breached these duties by its wrongful acts and omissions resulting in the contamination and failure to take action to prevent further migration of the contamination.

327.   As set forth above, Defendant's intentional conduct, acts, and omissions when it processed, handled, stored, and/or disposed of hazardous, toxic, and radioactive waste materials at the Plant caused hazardous, toxic, and radioactive materials to enter and cause damage and injury to the property of Plaintiffs.

328.    Defendant's acts and omissions allowed materials to contaminate Plaintiffs' property in violation of applicable laws, regulations, and guidelines set forth above, including, to the extent it is applicable to 10 C.F.R. § 20.1301, *et seq.* and its predecessors.

329.    Defendant did not have permission, authority, or right to allow any of its hazardous, toxic, and radioactive materials to enter Plaintiffs' property, and the contamination onto Plaintiffs' property is unlawful and without their consent.

330.    As set forth above, Defendant knew that its intentional conduct, acts, and omissions would cause hazardous, toxic, and radioactive materials to enter and cause damage and injury the property of Plaintiffs.

331.    Despite Defendant's knowledge of the presence of its hazardous, toxic, and radioactive materials on Plaintiffs' property, contaminating the property, Defendant has failed to remove or otherwise remediate the contamination of Plaintiffs' property.

332.    Defendant's intentional conduct, acts, and omissions interfered with, and continue to interfere with, Plaintiffs' possession of their property.

333.    Defendant's actions and omissions have caused and will continue to cause damage to Plaintiffs' property, including, but not limited to, unreimbursed expenses and costs, other violations of their rights, and exposure to hazardous, toxic, and radioactive substances sufficient to require medical monitoring as set forth above.

## COUNT ONE, SUBPART (D)
### *(Nuisance)*

334.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

335.    The contamination of Plaintiffs' property occurred and persists because of all Defendant's acts and omissions including, but not limited to, its operation and maintenance of its

facility and equipment, its handling, storage, use, and disposal of hazardous, toxic, and radioactive materials, and its failure to promptly and effectively address such contamination to prevent further mitigation of the contaminants.

336.    The actions and omissions of Defendant in allowing hazardous, toxic, and radioactive materials to contaminate Plaintiffs' property in violation of applicable laws, regulations, and guidelines set forth above, including, to the extent it is applicable, 10 C.F.R. § 20.1301, *et seq.* and its predecessors, constitutes a nuisance, which has substantially interfered with Plaintiffs' use, development, and enjoyment of their property.

337.    Defendant's acts and omissions have been committed intentionally and/or with such gross negligence as to indicate a wanton or reckless disregard of the rights of others.

338.    Defendant's actions have caused and will continue to cause damage to Plaintiffs Properties, including but not limited to unreimbursed expenses and costs, other violations of Plaintiffs' property rights, and exposure to hazardous, toxic, and radioactive substances sufficient to require medical monitoring as set forth above.

## COUNT ONE, SUBPART (E)
### *(Strict Liability)*

339.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

340.    As set forth above and at all relevant times, Defendant was engaged in ultra-hazardous or abnormally dangerous activities related to its operation of the nuclear facility.

341.    As a direct and proximate result of Defendant's ultra-hazardous and abnormally dangerous activities, Plaintiffs suffered physical damage and contamination to their property of Defendant's hazardous, toxic, and radioactive materials in violation of applicable laws, regulations,

and guidelines set forth above, including, to the extent it is applicable, 10 C.F.R. § 20.1301, *et seq.* and its predecessors.

342.    As a direct and proximate result of the ultra-hazardous and abnormally dangerous activities, Plaintiffs' property has continuously sustained severe damages by the contamination of Defendant's hazardous, toxic, and radioactive materials, and Plaintiffs have been exposed to hazardous, toxic, and radioactive substances sufficient to require medical monitoring as set forth above.

**COUNT ONE, SUBPART (F)**
***(Medical Monitoring)***

343.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

344.    Plaintiffs' citizens, properties and areas of governance were significantly exposed to Defendant's hazardous, toxic, and radioactive waste materials through Defendant's tortious acts and omissions.

345.    As a proximate result of that exposure, Plaintiffs suffer an increased risk of contracting a serious latent disease, as set forth more fully above.

346.    As a result of that increased risk of contracting serious latent diseases, periodic diagnostic medical examinations are necessary.

347.    As set forth above, medical monitoring and testing procedures exist and are necessary to make the early detection and treatment of the disease possible and beneficial.

**COUNT TWO**
***(State Law Claims as to Non-Radioactive Hazardous Substances/Wastes Only)***

348.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

349.     Upon information and belief, Defendant, throughout the time period in which the Plant operated, caused contamination of the City and County through various, frequent, and repeated releases in violation of applicable federal and state permits, regulations and statutes of antimony, fluorine, hydrofluoric acid and other fluorinated compounds including but not limited to calcium fluoride.

350.     To the extent that the contamination of the Plaintiffs' and Class Members' properties and other resulting damages are caused by non-radioactive releases, substances, and/or wastes, Plaintiffs assert the same claims set forth *supra* in Count One, Subparts A through E, as arising solely under Illinois' state law.

351.     Plaintiffs and the Class have been and continue to be exposed to hazardous and toxic materials, substances, and wastes at a concentration higher than expected for the general populace.

352.     Plaintiffs and the Class face a lifetime of latent and dreaded medical conditions proven to be linked to exposure to hazardous and toxic materials, substances, and wastes.

353.     Defendant's tortious actions resulting in hazardous and toxic materials, substances, and waste pollution have invaded the legal protections afforded Plaintiffs and the Class by the laws of Illinois.

354.     Plaintiffs and the Class will benefit from medical monitoring for the aforementioned medical conditions because testing and continued monitoring will bring to light the onset of these medical conditions so that treatment and intervention may begin at the earliest point possible.

355.     Plaintiffs and the Class will benefit from a medical monitoring program featuring an epidemiological component that collects and analyzes medical monitoring results so that other heretofore unrecognized latent, dreaded diseases that may be associated with exposure to hazardous and toxic materials, substances, and wastes may be identified so that treating professionals may

better care for the Class Members and so that medical professionals engaged in the research and development of new treatment will have access to a broader universe of data.

## COUNT THREE
### *(Violation of CERCLA, 42 U.S.C. § 9601 et seq.)*

356.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

357.    Honeywell is liable for its release of hazardous substances under Section 107(a) of the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a), for response costs incurred, damages to natural resources (including assessment costs), and the cost of necessary health assessment and/or health effects studies.

358.    Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides, in part:

> (1) the owner and operator of a vessel or a facility…
> (4) …from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for −…  (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title.

359.    Defendant Honeywell is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21). Honeywell is a current "owner and operator of a vessel or facility" under 42 U.S.C. § 9607(a). CERCLA Section 101(9) defines "facility" to include "(A) any building, structure, installation, equipment, … storage container, …or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located …" 42 U.S.C. § 9601(9).

360.    The release of radiation and other hazardous substances at the Plant constitutes "emitting," "escaping," and /or "disposing into the environment," and are thus "releases" as defined under 42 U.S.C. § 9601(22).  The substances involved are "hazardous substances" as defined by 42 U.S.C. § 9601(14), as they are considered "hazardous wastes" under Section 112(b) of the Clean Air Act or are mixtures of materials that contain hazardous substances that are listed at 40 C.F.R. § 302.4. There are also threatened releases of explosive dust and other hazardous substances from the Facility. These releases and threatened releases have caused, or threaten to cause, impacts to the environment, including soil, surface water, and groundwater, and including but not limited to Plaintiffs' properties. These releases include releases in which Defendant owned and operated the Facility at the time of disposal.

361.    Plaintiffs have incurred response costs responding to Defendant's release of hazardous substances, in the form of substantial investigation and sampling costs necessary to determine the nature and extent of the releases and contamination of the area around the Plant. These costs now exceed $800,000 spent to date on collecting environmental samples and surveying the Plant, lab fees for the analysis of said sampling protocols, and otherwise conferring with Plaintiffs' experts as to Defendant's contamination as alleged above.  The response costs incurred by Plaintiffs are consistent with the National Contingency Plan, 40 C.F.R. Part 300.

362.    Plaintiffs' responses costs are, to date, ongoing.  Plaintiffs are entitled to declaratory relief with respect to their future response costs consistent with the National Contingency Plan for damages related to the contaminated property.

363.    Plaintiffs seek under CERCLA that a medical surveillance and medical monitoring plan be implemented.

364.    The releases of hazardous substances occurred at a facility owned and operated by Defendant, who is therefore "liable" for response costs under § 107(a) of CERCLA, 42 U.S.C. § 9607(a)(1). Plaintiffs seek to recover response costs from Honeywell and any other available relief under CERCLA Section 107(a).

365.    The Declaratory Judgment Act, 28 U.S.C. § 2201 provides, in relevant part, that "In a case of actual controversy within its jurisdiction, … any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

366.    An actual controversy exists between the parties stemming from the cost of removal and the costs of remediating the Plaintiffs' properties and the Defendant's refusal to do so.

367.    Plaintiffs are entitled to, and request, a declaratory judgment that the Defendant is liable under CERCLA Section 107(a), 42 U.S.C. § 9607(a), for all future and past response costs, removal costs, and remediation costs, including but not limited to costs of investigation and cleanup consistent with the National Contingency Plan in subsequent actions for further responses costs, which are incurred by the Plaintiffs.

368.    A copy of this amended complaint will be provided to the Attorney General of the United States and to the Administrator of the United States Environmental Protection Agency, in accordance with CERCLA 42 U.S.C. § 9613(l).

## VIII.   PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1)    Abatement of impending threat to the community presented by the Defendant's unsafe emissions controls.

79

(2)   Abatement of the imminent and substantial threat to the health of the community presented by the Defendant's unsafe emissions controls through the establishment of a medical monitoring to protect the people of Metropolis and Massac County from the risk of latent dread disease.

(3)   Money damages for diminution in value and the remediation of impacted city and county properties contaminated by the radioactive and toxic waste emitted from the Plant.

Respectfully Submitted,

*/s/ James F. Clayborne*
James F. Clayborne, Jr.
**Clayborne, Sabo and Wagner LLP**
525 W. Main Street, Suite 105
Belleville, Illinois 62220
Tel. (618) 239-0187
Fax (618) 416-7556
Email: jclayborne@cswlawllp.com

Katrina Carroll
Kyle A. Shamberg
Nicholas Lange
**CARLSON LYNCH LLP**
111 W. Washington Street, Suite 1240
Chicago, Illinois 60602
Tel. (312) 750-1265
Fax: (312) 212-5919
Email: kcarroll@carlsonlynch.com
        kshamberg@carlsonlynch.com

Richard Kruger
Paul Henry
**Kruger, Henry and Hunter, LLC**
110 W. Fifth Street
Metropolis, Illinois 62960
Tel. (618) 524-9302
Fax (618) 524-9305
Email: khh@khhlaw.com
        phenry@khhlaw.com

80

Celeste Brustowicz (*Admitted pro hac vice*)
Stuart H. Smith (*Admitted pro hac vice*)
Stephen H. Wussow (*Admitted pro hac vice*)
Victor Cobb (*Admitted pro hac vice*)
**Cooper Law Firm, LLC**
1525 Religious Street
New Orleans, LA 70130
Tel. 504-399-0009
Email: cbrustowicz@sch-llc.com
        swussow@sch-llc.com

Kevin W. Thompson (*Admitted pro hac vice*)
David R. Barney, Jr. (*Admitted pro hac vice*)
**Thompson Barney**
2030 Kanawha Boulevard, East
Charleston, West Virginia 25311
Tel. (304) 343-4401
Fax (304) 343-4405
Email: kwthompsonwv@gmail.com
        drbarneywv@gmail.com

Ron A. Austin (*Admitted pro hac vice*)
Catherine Hilton (*Admitted pro hac vice*)
**Ron Austin & Associates, LLC**
920 Fourth Street
Gretna, LA 70053
Tel. (504) 227-8100
Fax (504) 227-8122
Email: raustin@ronaustinlaw.com

***ATTORNEYS FOR PLAINTIFFS***

81

JS 44 (Rev. 10/20)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

CITY OF METROPOLIS, ILLINOIS, and COUNTY OF MASSAC

### DEFENDANTS

HONEYWELL INTERNATIONAL, INC.

**(b)** County of Residence of First Listed Plaintiff  Massac
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Massac
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

James F. Clayborne (618) 239-0187
525 W Main St, Ste 105, Belleville, IL 62220

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1  U.S. Government Plaintiff
- [x] 3  Federal Question *(U.S. Government Not a Party)*
- [ ] 2  U.S. Government Defendant
- [ ] 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [x] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [x] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | PERSONAL INJURY / PERSONAL INJURY | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane / [ ] 365 Personal Injury - | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability / Product Liability | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & / [ ] 367 Health Care/ | | PROPERTY RIGHTS | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | Slander / Pharmaceutical Personal Injury | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 330 Federal Employers' / Product Liability | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | Liability / [ ] 368 Asbestos Personal | | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| | [ ] 340 Marine / Injury Product | | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| | [ ] 345 Marine Product / Liability | | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | Liability | LABOR | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 160 Stockholders' Suits | [ ] 350 Motor Vehicle / PERSONAL PROPERTY | [ ] 710 Fair Labor Standards Act | | |
| [ ] 190 Other Contract | [ ] 355 Motor Vehicle / [ ] 370 Other Fraud | [ ] 720 Labor/Management | SOCIAL SECURITY | [ ] 490 Cable/Sat TV |
| [ ] 195 Contract Product Liability | Product Liability / [ ] 371 Truth in Lending | Relations | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 196 Franchise | [ ] 360 Other Personal / [ ] 380 Other Personal | [ ] 740 Railway Labor Act | [ ] 862 Black Lung (923) | [x] 890 Other Statutory Actions |
| | Injury / Property Damage | [ ] 751 Family and Medical | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| | [ ] 362 Personal Injury - / [ ] 385 Property Damage | Leave Act | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| | Medical Malpractice / Product Liability | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| REAL PROPERTY | CIVIL RIGHTS / PRISONER PETITIONS | [ ] 790 Other Labor Litigation | FEDERAL TAX SUITS | [ ] 896 Arbitration |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights / Habeas Corpus: | [ ] 791 Employee Retirement Income Security Act | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 220 Foreclosure | [ ] 441 Voting / [ ] 463 Alien Detainee | | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment / [ ] 510 Motions to Vacate | | | |
| [ ] 240 Torts to Land | [ ] 443 Housing/ / Sentence | | | |
| [ ] 245 Tort Product Liability | Accommodations / [ ] 530 General | | | |
| [ ] 290 All Other Real Property | [ ] 445 Amer. w/Disabilities - / [ ] 535 Death Penalty | IMMIGRATION | | |
| | Employment / Other: | [ ] 462 Naturalization Application | | |
| | [ ] 446 Amer. w/Disabilities - / [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | Other / [ ] 550 Civil Rights | | | |
| | [ ] 448 Education / [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1  Original Proceeding
- [ ] 2  Removed from State Court
- [ ] 3  Remanded from Appellate Court
- [ ] 4  Reinstated or Reopened
- [ ] 5  Transferred from Another District *(specify)*
- [ ] 6  Multidistrict Litigation - Transfer
- [ ] 8  Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 2014(q)

Brief description of cause:
Damages, equitable, and Injunctive Relief

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND: [x] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE  Staci Yandle

DOCKET NUMBER  3:18-cv-1124

DATE  7/19/21

SIGNATURE OF ATTORNEY OF RECORD  *James F. Clayborne*

## FOR OFFICE USE ONLY

RECEIPT #_____  AMOUNT_____  APPLYING IFP_____  JUDGE_____  MAG. JUDGE_____